**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| VIJAY KUMAR, *Petitioner*, v. ERIC H. HOLDER, JR., Attorney General, *Respondent*. | No. 08-72119 Agency No. A072-671-421 OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
March 11, 2013—San Francisco, California

Filed August 29, 2013

Before: John T. Noonan, Raymond C. Fisher, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Noonan

## SUMMARY[*]

### Immigration

The panel granted a petition for review concluding that the Board of Immigration Appeals erred in failing to consider the circumstances particular to petitioner's service as a prison guard in India in denying him asylum and withholding of removal pursuant to the persecutor of others bar of 8 U.S.C. § 1158(b)(2)(A)(I).

The panel held that in determining whether petitioner's actions rose to the level of "personal involvement" triggering the persecutor bar, the BIA misunderstood and misapplied relevant precedent, including *Miranda Alvarado v. Gonzales*, 449 F.3d 915 (9th Cir. 2006) and *Fedorenko v. United States*, 449 U.S. 490 (1981). The panel remanded for the Board to determine whether petitioner purposefully assisted in the alleged persecution of prisoners.

### COUNSEL

David J. Kaufman, San Francisco, California, for Petitioner.

Matt A. Crapo, Department of Justice, Washington, D.C., for Respondent.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

NOONAN, Circuit Judge:

Vijay Kumar petitions for review of the denial of his appeal by the Board of Immigration Appeals (the BIA).  We hold that the BIA erred in failing to consider the circumstances particular to Kumar's service as a prison guard in India.  We grant the petition and remand for further consideration.

## FACTS

In June 1989, Kumar, age 24, joined the Punjab police. He was trained for seven months and was then posted in Tarn Tarn as a constable.  After more than a year there, Kumar was assigned to patrol the superintendent's residence.  His primary duty was to stand in front of the gate. When visitors came, he informed the people inside the residence.

In June 1992, Kumar was assigned to serve as staff for an intelligence agency in Tarn Tarn. His duties were to stand in front of the gate of the agency's building, which was used to house and interrogate those suspected of being a part of the Khalistan movement seeking to create a separate Sikh country. The suspects were kept in the "havalaat," i.e., jail. Kumar did not arrest, transport, or question the prisoners.

Kumar testified at his immigration hearing that he witnessed prisoners being mistreated. The first time he witnessed such mistreatment happened one evening, while he was off-duty. On his way to get food from the mess hall, he saw Inspector Sooba Singh, his superior, beating several people in the courtyard with a rod. The beating occurred for

approximately five minutes. Kumar reported what he saw to the head constable, telling him that the beating was torturous and not correct. The head constable told Kumar to "be quiet," adding "This is not in the scope of your duty." He instructed Kumar not to mention this type of incident again.

Kumar spoke to other constables about the mistreatment, "many of whom used to say that this is really, really very bad, very bad. That they should not do this, that they bring people in and torture them like that." The men who were tortured did not call the constables for help. At the hearing Kumar was asked why he did not do more to help the prisoners. Kumar replied that he wanted to do more but that he "was just a constable."

During his final month at the intelligence agency, Kumar applied for the position of head constable. He qualified for the position because he had worked three years for the police and had passed a test called the B-1 exam, offered once every three years. He took the test on January 1, 1993 and became a head constable on January 9, 1993. The duty of the head constable consists primarily of supervising constables and ensuring that they stand at their posts. Kumar did not witness any of his four subordinates mistreating any prisoner.

Three days after being promoted to head constable, Kumar spoke to Inspector Singh about the abuse he had witnessed. He told Inspector Singh of an incident regarding a boy, Jasbir Singh, who had served in the police force with Kumar. The intelligence agency had suspected Jasbir of being an extremist and had imprisoned him in the havalaat. Jasbir had died. Kumar told Inspector Singh that "this was not correct," and that "it is really, really wrong that he [Jasbir] had died injustly." Inspector Singh responded by "calling

[Kumar] bad names." Kumar stated, "He started saying to me whether it is wrong or right, this is not your duty. This is not within the scope of your duty." Inspector Singh said, "[K]eep your mouth shut. If you . . . see these things again, just disappear from my presence."

Kumar testified that he found the corpses of three prisoners who had died inside the havalaat. Kumar knew the identities of two of them: the father of Jasbir Singh and a village sarpanch (a village consult head). Kumar ran to a higher official in the agency and told him that there were men who had been killed in the havalaat. Kumar testified, "I was very nervous, but he stayed poised . . . as though he knew already." The higher official then called Inspector Singh, and the agency staff retrieved the bodies. When Kumar again complained to Inspector Singh, he was told to "go away from here." Kumar left the office. Not satisfied with Inspector Singh's response, Kumar then informed a higher-ranking official, Narrinder Pal, the Superintendent of Police. He told Superintendent Pal, "Jasbir Singh was just killed like this, and many other men have been killed in a similar way. And after that, Jasbir Singh's father was also killed there. . . . This is against humanity to kill someone like that." In response, Superintendent Pal "started calling me names and asked me, 'Do you wish to be killed like that, too?' He said keep your mouth shut and disappear from my sight."

The day following his conversation with the superintendent, Kumar was transferred from the agency, having served nineteen days as head constable. His duty was to supervise four officers who patrolled the residence of a higher official. At times he was also assigned to patrol a bank or a bazaar. His work was "fine" because "there is no brutal beating that you see and you just do your work."

Kumar also testified that, after he left the intelligence agency, a friend of his warned Kumar that Kumar's safety was in danger. The friend, now the bodyguard of an official, asked Kumar what had taken place with Superintendent Pal. Kumar told his friend, "I said to him I didn't complain. I only said to him that I informed him as to whatever was going on was not correct." The friend urged Kumar, "[I]f you see something . . . use caution," and stated that "his [Superintendent Pal's] men may, might kill you."

Ten days after the conversation with Superintendent Pal, in February 1993, Kumar told his supervisors that he was going to spend his one day holiday in his own village in Fardipore, where his brother and parents resided. However, afraid of retaliation, he decided not to return to his own village, and instead stayed with his in-laws in Sujanpore. Several days later, his brother told him that four men with guns and dressed in civilian clothes had come to the family home. Kumar's brother told them that Kumar was not there. The men accused his brother of lying and said that Kumar had told them that he would be there. At the hearing Kumar was asked why, assuming these men worked for Superintendent Narrinder Pal, they could not simply look for Kumar at the police line, where "presumably they would have known [where Kumar was] assigned." Kumar explained that these men were likely "police's cat[s]," meaning that they worked for "high officials" and "were policemen, but they were not officially police." Their work was not for the police but "private." Kumar explained, "It's like this. When I was at the police line then these civil people over there . . . cannot touch you, cannot kill you."

A month later, in March 1993, Kumar spent his one day holiday by seeing his sister, who lives in Amritsar. Kumar's

brother later told him that, on the day of his holiday, the same men with guns had again come to his home village looking for Kumar. In April, Kumar spent his one day holiday visiting the bazaar. He was dressed in civilian clothes. He spotted two of Superintendent Pal's men coming behind him, following him. These men told Kumar to stop, adding that they had to speak to him. Kumar testified, "And I thought if I were to stand near them, possibly they would kill me or they would harm me. And then I ran and [got] back [to] police line [in] Tarn Tarn."

Around the time of the incident in the bazaar, Kumar testified, "I started thinking that it wasn't okay for me to keep on living there. After that, I spoke to my father. I told him about all of these things. That those men who had come to their home, I had no idea who they were. That . . . they would kill me." His father advised him to leave India and took Kumar to Delhi. His father spoke to people affiliated with the church, who helped Kumar obtain a visa. Kumar testified, "I had come here [to the United States] to save my life and I saved myself."

At Kumar's hearing, the government attorney asked Kumar what he would have done had he not been sent back to the police line. The attorney asked, "[Y]ou would have remained at the [intelligence agency's] . . . facility where you were at, isn't it true?" Kumar replied, "Had I not complained, had I not spoken against my office . . . it might have been possible I would have stayed. But since I did, I was transferred back."

During his time as a policeman, Kumar did not use his rifle or baton. Kumar also did not arrest any person. In total Kumar worked four years as a policeman, six months at the

intelligence agency, nineteen days of which he served as head constable.

***Proceedings.*** On April 22, 2005, the Immigration Judge (IJ) rendered an oral decision, finding Kumar to be credible and describing him as a "truthful witness." Kumar was "plainly upset" by the mistreatment he witnessed. Nonetheless, the IJ reasoned that Kumar's service as a guard was "analogous" to the actions of Fedorenko, a Nazi prison guard found to be barred from entry due to his acts of persecution in *Fedorenko v. United States*, 449 U.S. 490 (1981). Kumar's position "was integral to the security of the [intelligence agency staff] and, therefore, to its functioning." Because the Immigration and Nationality Act (INA) forbids the granting of asylum to those who "ordered, incited, assisted, or otherwise participated in the persecution" of any person, the IJ denied Kumar's applications for asylum and withholding of removal on the grounds that Kumar had assisted in the persecution of others. 8 U.S.C. § 1158(b)(2)(A)(I). The IJ granted him deferral of removal under the Convention Against Torture (CAT).

On May 13, 2005, Kumar timely appealed the IJ's denial of asylum and withholding of removal claims to the BIA.

On May 9, 2008, the BIA issued a final order of removal, incorporating its prior decision dismissing Kumar's appeal. The BIA agreed with the IJ that Kumar failed to establish eligibility for asylum and withholding of removal because he had assisted in the persecution of others on account of political opinion. The BIA affirmed the IJ's finding that Kumar's "position as a sentry or guard, a constable and later head constable . . . was analogous to that of the petitioner in *Fedorenko v. United States*." The BIA also agreed with the

IJ's finding that Kumar was eligible for deferral of removal under the CAT, because he would more likely than not be subjected to harm in India. The BIA found that Kumar had credibly testified that he fled India after learning that a high-ranking inspector at a penal institution had threatened him.

*Jurisdiction*. The BIA had jurisdiction over Kumar's appeal pursuant to 8 C.F.R. §§ 1003.1(b)(3) and 1240.15, granting the BIA appellate jurisdiction over decisions made by immigration judges in removal proceedings. The IJ had authority to conduct Kumar's removal proceedings pursuant to 8 U.S.C. § 1229a and 8 C.F.R. § 1003.10.

The court's jurisdiction is governed by Section 242 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252. Kumar timely filed his petition for review.

*Standard of Review.* Because the BIA expressed agreement with the reasoning of the IJ, this court reviews both the IJ and the BIA's decisions. *See Nuru v. Gonzales*, 404 F.3d 1207, 1215 (9th Cir. 2005). This court reviews legal questions de novo, and the agency's factual findings are reviewed for substantial evidence. *See Zehatye v. Gonzales*, 453 F.3d 1182, 1184–85 (9th Cir. 2006). Because the BIA did not make an adverse credibility finding, this court must accept Kumar's testimony as true for purposes of review. *Navas v. INS*, 217 F.3d 646, 652 n.3 (9th Cir. 2000); *Halaim v. INS*, 358 F.3d 1128, 1131 (9th Cir. 2004).

## ANALYSIS

Does the statute's bar to entry into this country by a persecutor exclude a police officer who tortured no prisoner, interrogated no prisoner, struck no prisoner, and who himself

risked his job and lost it by protesting the treatment of several prisoners? We conclude that in determining whether Kumar's actions rose to the level of "personal involvement" triggering the persecutor bar, the BIA misunderstood and misapplied relevant precedent. We therefore grant Kumar's petition for review and remand to the BIA for reconsideration.

In *Miranda Alvarado v. Gonzales*, 449 F.3d 915 (9th Cir. 2006), we established the requirements for analyzing the applicability of the persecutor bar under the INA. We held that the law "requires a particularized evaluation of both personal involvement and purposeful assistance in order to ascertain culpability." *Id*. at 927. We drew our analysis heavily from *Fedorenko.* There, the Supreme Court suggested that certain actions may not rise to a level sufficient to establish purposeful assistance in persecution and thus may not trigger the persecutor bar in the now-defunct Displaced Persons Act of 1948, Pub. L. No. 80-774, 62 Stat. 1009 (1948) (DPA). *Fedorenko*, 449 U.S. at 512 n.34. The DPA authorized the admission into the United States of certain European displaced persons for permanent residence after World War II. Mindful that the DPA has a different structure and purpose than the INA, we nonetheless are guided by *Miranda Alvarado*'s interpretation of *Fedorenko* as establishing a "continuum of conduct against which an individual's actions must be evaluated so as to determine personal culpability." *Miranda Alvarado*, 449 F.3d at 926. *See also Negusie v. Holder*, 555 U.S. 511 (2009) (holding that *Fedorenko*'s rule that voluntariness is irrelevant to culpability

with respect to the DPA's persecutor bar need not be applied to the analogous INA persecutor bar).[1]

Regarding the first factor of *Miranda Alvarado*, personal involvement in alleged persecution, we examine whether the petitioner's involvement was active or passive. *See Miranda Alvarado*, 449 F.3d at 927–28. Whereas Miranda was "undisputedly a regular part of interrogation teams," "present and active during the alleged persecution," Kumar did not take part in the interrogation, and was neither present nor active during the alleged persecution. *Id*. at 928. Indeed, Kumar arrived at the intelligence facility as a constable, the lowest rung. Kumar did not arrest or physically hurt any prisoners. His duties were not related to disciplining the prisoners. The record does not indicate that Kumar prevented prisoners from attempting to escape. The IJ and BIA failed to consider whether an individual such as Kumar, who was not actively involved in the persecutive acts taken at Tarn Tarn and whose involvement with the alleged persecution was highly attenuated, nonetheless may be subject to the persecutor bar.

Second, to determine whether the petitioner purposefully assisted in the alleged persecution, we examine whether the petitioner's acts were material to the persecutory end. *Miranda Alvarado* teaches that "[w]hether [petitioner's] assistance was material is measured by examining the degree

---

[1] Because we conclude that the BIA erred in analyzing whether Kumar's actions demonstrate his "personal involvement" in persecution that occurred at Tarn Tarn, and because Kumar concedes that his work was voluntary, we need not remand for reconsideration under *Negusie*, which focused on whether the persecutor bar under the INA should be applied to claims that the assistance in persecution was coerced or performed under duress. *See Weng v. Holder*, 562 F.3d 510, 514–15 n.1 (2nd Cir. 2009).

of relation his acts had to the persecution itself: How instrumental to the persecutory end were those acts? Did the acts further the persecution, or were they tangential to it?" *Id.* Here, the IJ lacked the benefit of *Miranda Alvarado*, and the BIA misconstrued *Miranda Alvarado*'s integral participation requirement. The BIA stated that Kumar's work as a constable "was integral to the security of the [intelligence facility], and therefore, to its functioning." *Miranda Alvarado* makes clear that for the integral participation requirement to be met, a prison employee's work must be integral *to the persecution* that occurred. *See Miranda Alvarado*, 449 F.3d at 928. An employee's work may be integral to a prison facility but not to the persecution that occurs within it. For instance, a cook or a plumber who works at a prison may be integral to the functioning of the facility, but his duties are hardly integral to the persecution that might occur within the prison's walls. Here, we remand to the BIA to consider whether the work of a sentry on the perimeter of an intelligence agency is integral not only to the functioning of the facility but also *to the persecution* that occurred inside of it.

Further, we note that, in analyzing whether Kumar's participation was integral to the alleged persecution, the IJ and BIA erroneously concluded that Kumar's role as a Tarn Tarn constable was analogous to that of the petitioner in *Fedorenko*. Obvious differences exist between Nazi guards at Nazi concentration camps and members of a legitimate law enforcement agency in India (the Punjabi police force), stationed at a legitimate prison facility (Tarn Tarn). As the Sixth Circuit has cautioned, analysis of the persecutor bar "when applied to an alien who is accused of having 'assisted or participated in persecution' in the context of working for a legitimate arm of a recognized government differs

materially from that analysis when applied to an alien who served as a Nazi concentration camp guard." *Diaz-Zanatta v. Holder*, 558 F.3d 450, 452 (6th Cir. 2009). As a member of a legitimate arm of a democratically elected government, Kumar contrasts markedly with a guard at a Nazi concentration camp.

Finally, the BIA misapplied *Miranda Alvarado*'s requirement of evaluating extenuating circumstances, including whether the alleged persecutor was acting in self-defense, in order to determine whether the petitioner has assisted or otherwise participated in persecution. *Miranda Alvarado*, 449 F.3d at 925–27; *see also Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1252 (9th Cir. 2004). The BIA stated that Kumar "did not leave his position until he felt threatened as a result of complaints he had made." The BIA likely relied on the IJ's statement that it was "of some importance" that Kumar testified he would have continued to guard the intelligence agency had he not been transferred. In other words, Kumar would have stayed at the agency even if he became convinced that he was powerless to stop the mistreatment. This hypothetical should not function as a legal argument. The law commands us to evaluate the particular behavior that actually occurred. Whereas Miranda "did not seek to resign for six years," the very reason Kumar was transferred from his position from the agency lay in his repeated decisions to speak up: He took a risk in complaining and was subjected to threats as a consequence. *Miranda Alvarado*, 449 F.3d at 929.

***Conclusion.*** The decisions of the IJ and BIA reflect a misunderstanding and misapplication of relevant precedent. We remand under *INS v. Ventura*, 537 U.S. 12 (2002), to consider whether Kumar purposefully assisted in the alleged

persecution. In doing so, the BIA should consider in particular (a) whether the work of a sentry on the perimeter of an intelligence facility is integral not only to the functioning of the facility but also to the persecution that occurred inside of it, and (b) the differences between the role of a Nazi guard at a Nazi concentration camp and Kumar, an individual working for a legitimate arm of a recognized government at a legitimate prison facility.

**PETITION GRANTED; REMANDED**.