Partial Concurrence and Partial Dissent by Judge CALLAHAN
OPINION
TASHIMA, Circuit Judge:
Budiono, a native of Indonesia, petitions for review of a Board of Immigration Appeals’ (the “Board”) decision affirming the Immigration Judge’s (“IJ”) order of removal. The IJ determined that although Budiono otherwise qualified for withholding of removal, he was barred from relief due to his material support of a terrorist organization. We have jurisdiction under 8 U.S.C. § 1252(a), We conclude that substantial evidence does not support the IJ’s finding that the organization engaged in terrorist activities; we therefore grant the petition for review.
I.
A. Factual Background
Budiono entered the United States on July 11, 2000, on a nonimmigrant visitor’s visa. He remained in the United States after his visa expired. In 2003, after Bu-diono registered under the former National Security Entry-Exit Registration System program, the Department of Homeland Security (“DHS”) initiated removal proceedings, Although Budiono conceded removability, he applied for asylum, withholding of removal, and relief under the Convention Against Torture (“CAT”).
In support of his claims, Budiono credibly testified[1] to the following: In about 1990, when he was 17 years old, Budiono joined a Jakarta-based Muslim community group Jemaah Muslim Attaqwa (“JMA”). At the time, the JMA’s primary purpose was to provide volunteer services to the neighborhood, including fixing homes, delivering medicine to people in. hospitals, and teaching the tenets of Islam to children and the poor. Around 1998, the group’s rhetoric began to change, becoming increasingly intolerant of non-Muslims. Members of the JMA participated in violent anti-government riots in May 1998 and may have caused the deaths of at least two people, as well as substantial property destruction, during the riots. Budiono testified that he did not take part in the riots and disagreed with the JMA’s increasingly militant stance.
In February 2000, the JMA asked Bu-diono to lead its fundraising efforts. The group hoped to use the funds to build a new mosque. Budiono understood that the fundraising position would require him to use “force” against those who were reluc *1045 tant to contribute funds. He refused the position and quit the organization in protest of the JMA’s tactics. A group of JMA men retaliated. They came to Budiono’s home, where they .beat, him, sexually assaulted his wife, and stole the family’s valuables. Although Budiono reported this assault to the police, they declined to intervene in what they considered to be a religious conflict.
A couple months later, members of the JMA (falsely) accused Budiono of mismanaging JMA funds. The police arrested Bu-diono and, upon taking him into custody, began beating him in an effort to extract a false - confession. The police held Budiono for two days until his wife paid a bribe of five million rupiah, an amount equivalent to about two months’ salary. Fearing further retribution, Budiono and his wife moved to the province of West Java, several hours from Jakarta. Unable to find work, Budiono and his wife obtained United States visas. They moved to the United States in July 2000.
Budiono testified that he hoped to return to Indonesia once the situation improved, presumably meaning after the trend toward radical Islam died down. However, in 2003, Budiono learned that a friend who had recently returned to Indonesia was tortured and killed by a radical Muslim group. Although that group was not affiliated with the JMA, the friend had rejected the group’s radical interpretation of Islam in much the same way that Budiono had rejected the JMA’s violent tactics. That same year, immigration officials served Budiono with a Notice to Appear. Budiono applied for asylum, withholding of removal, and CAT relief. Budiono claimed that the death of his friend constituted changed circumstances, excusing the late filing of his application for asylum.
B. Procedural History
In 2006, the IJ denied Budiono’s applications for relief, granting Budiono voluntary departure. The IJ rejected Budiono’s claim of changed circumstances, reasoning that the death of Budiono’s friend did not indicate that the situation facing moderate Muslims' in Indonesia had changed significantly since Budiono left. The IJ therefore concluded that Budiono’s application for asylum was time-barred. See 8 U.S.C. § 1158(a)(2)(D); 8 C.F.R. § 1208.4(a)(4). The IJ next determined that Budiono failed to prove past persecution, or a credible fear of future persecution, on any protected ground, disqualifying him from withholding of • removal.. See 8 C.F.R. § 1208.16(b). Alternatively, the IJ held that Budiono was ineligible for withholding of removal because he had contributed material support to the JMA, which the IJ found to be a terrorist organization under 8 U.S.C. § 1182(a)(3)(B). The IJ also denied Budiono CAT relief. See 8 C.F.R. § 208.16(c).
Budiono appealed. In August 2008, the Board sustained the appeal and remanded for further factfinding.[2] The Board agreed with the IJ that no changed circumstances excused Budiono’s late asylum application. However, the Board remanded for reconsideration of the IJ’s denial of withholding of removal. The Board held that, contrary to the IJ’s conclusion, Budiono’s testimony proved past persecution on account of his religious beliefs. It remanded “to afford the DHS an opportunity to show whether the respondent could relocate in Indonesia or whether conditions have changed so that the respondent no longer possesses a clear probability of persecution.... ” See 8 C.F.R. § 1208.16(b)(1)(A), (B). In addition, the Board remanded for further proceed *1046 ings to determine whether the JMA was a terrorist organization. The Board held that the IJ’s “conclusion on that issue [was] not supported by sufficient findings of fact....”
On remand, the IJ held a second hearing with a dual purpose: to afford the government an opportunity to address the issues of relocation and changed country conditions, and to gather further testimony from Budiono about the JMA and his role in the organization. The IJ concluded that Budiono had a well-founded fear of future persecution ahd could not reasonably relocate within Indonesia. Thus, Budiono qualified for withholding of removal. The IJ, however, denied Budiono’s application because Budiono had provided material support to the JMA. See 8 U.S.C. § 1182(a)(3)(B). The' IJ rejected Budiono’s testimony about the JMA at the second hearing as not credible; the IJ therefore relied entirely on Budiono’s testimony at the first hearing in 2006 to support his factual findings. The IJ found that the JMA “intentionally harmed others as well as property in Indonesia from at least 1998 to 2000” and that “such harm in some instances was inflicted because of ... religion; and/or decisions being made by the government.” The IJ concluded that the JMA was a terrorist organization, and that Budiono’s support of the JMA barred him from withholding of removal.
Budiono again appealed the IJ’s decision. In May 2012, the Board dismissed the appeal, entering a final removal order. The Board approved the IJ’s conclusion that, were it not for the terrorist bar, Budiono would be eligible for withholding of removal, adding that neither party challenged that conclusion on appeal. Nevertheless, the Board affirmed the IJ’s conclusion that Budiono was barred from relief due to his material support of the JMA. The Board stated that “the fact that [Budiono’s] testimony was often vague as to what type of violence was perpetrated by the JMA does not preclude a finding That the group was a terrorist organization.”[3] Budiono timely petitioned for review.
II.
We review de novo the Board’s legal conclusions. Flores-Lopez v. Holder, 685 F.3d 857, 861 (9th Cir. 2012). We review factual findings for substantial evidence; factual findings should be upheld “unless the evidence compels a contrary result.” Hernandez-Mancilla v. Holder, 633 F.3d 1182, 1184 (9th Cir. 2011). Our review is limited to those grounds explicitly relied upon by the Board. Najmabadi v. Holder, 597 F.3d 983, 986-87 (9th Cir. 2010). Accordingly, “[w]e review only the [Board’s] decision,. except to the extent that it expressly adopts the IJ’s opinion. Where the [Board] issues its own decision but relies in part on the immigration judge’s reasoning, we review both decisions.” Flores-Lopez, 685 F.3d at 861 (citations omitted).
III.
Budiono first contends that the Board erred in holding that his asylum claim was time barred. An applicant for asylum generally must request relief within one year of arriving in the United States. 8 U.S.C. § 1158(a)(2)(B). An exception to this rule applies if the applicant can prove “the existence of changed circumstances which materially affect the applicant’s eligibility for asylum.” Id. § 1158(a)(2)(D).
Budiono concedes that he did not apply for asylum until 2003, more than one year after his arrival in the United States. Bu- *1047 diono contends,, however, that the 2003 murder of his friend in Indonesia constitutes changed circumstances excusing his late filing. Budiono testified that this event prompted him to apply for asylum because it caused him' to realize how dangerous circumstances had become for religious moderates like him.
In 2008, the Board, adopting the IJ’s analysis, rejected Budiono’s changed circumstances claim.[4] The IJ reasoned that Budiono fled Indonesia because the JMA had radicalized; that is, by the time Bu-diono left, the group was already subjecting religious moderates to violence. Thus, the killing of Budiono’s friend at the hands of a different Muslim group was not a change from the circumstances Budiono faced before he fled. We agree. New evidence confirming what Budiono already knew — that moderate .Muslims may face violent repression in Indonesia — does not constitute changed circumstances. See Sumolang v. Holder, 723 F.3d 1080, 1083 (9th Cir. 2013) (finding no changed circumstances where “violence was at most no different in degree from the violence that had been ongoing when [the petitioner] left Indonesia in 1997”). We agree with the Board that Budiono’s late asylum filing is not excused.

TV.

Budiono also contends that the Board erred in concluding that he was barred from withholding of removal due to his material support of a terrorist organization. We agree. The IJ failed to make the requisite factual findings to support his conclusion that the JMA was a terrorist organization. Accordingly, Budiono’s support of the JMA cannot bar him from withholding of removal.
Under the Immigration and Nationality Act, any individual who “has engaged in a terrorist activity” is inadmissible to the United States and thus ineligible for withholding of removal. 8 U.S.C. § 1182(a)(3)(B)(i). An applicant for relief is deemed to have engaged in terrorist activity if that individual has committed “an act that the actor knows, or reasonably should know, affords material support” to a .terrorist organization. Id. § 1182(a)(3)(B)(iv). A terrorist organization is any group of two or more individuals engaged in “terrorist activity,” and .terrorist activity is further defined as one of several enumerated activities. Id. § 1182(a)(3)(B)(vi)(VI). Those enumerated activities include hijacking, kidnapping, assassination, and, most relevant to this case, “[t]he use of any ... explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.” Id. § 1182(a)(3)(B)(iii).
An applicant for relief from removal must demonstrate eligibility for the relief sought. Id. § 1229a(c)(4)(A); see also 8 C.F.R. § 1240.8(d). “If the evidence indicates” that a mandatory bar to relief, such as the terrorist bar, may apply, “the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.” 8 C.F.R. § 1208.16(d)(2) (describing burden of proof for withholding of removal); see also id. § 1240.8(d) (describing burden of proof for relief applications generally).
*1048 A. Threshold Evidentiary Showing
We have yet to decide whether the government must first make a threshold evidentiary showing that the terrorist bar may apply and, if so, what showing is sufficient. First, it is clear from the text of the regulations that the record must contain at least some evidence that the bar applies before the applicant must prove otherwise. The government would have us hold that the applicant’s burden of proof arises where the record contains only generalized evidence suggesting that an organization was violent. We decline the government’s invitation; instead, we apply the same burden-of-proof framework that we apply in the context of the persecutor bar. In that line of cases, we require a threshold showing of particularized evidence of the bar’s applicability before placing on the applicant the burden to rebut it.
Under the persecutor bar, “determining whether a petitioner ‘assisted in persecution’ requires a particularized evaluation of’ two separate requirements: “personal involvement and purposeful assistance.” Miranda Alvarado v. Gonzales, 449 F.3d 915, 927 (9th Cir. 2006), The persecution must also be based on a protected ground, which would qualify the persecuted individual for refugee status in the United States. Id. at 930. Thus, persecution cases are especially instructive because, as with the terrorist bar, the persecution bar consists of several elements. In those cases, we have required threshold evidence of each element before the burden of proof shifts to the applicant. Generalized evidence that the applicant was involved with a persecuting group is not enough. The same is true for the terrorist bar.
In Miranda Alvarado, we held that the evidence indicates that the persecution bar applies when the evidence is “sufficient to raise the inference that” the bar applies. Id. at 930, In Kumar v. Holder, 728 F.3d 993 (9th Cir. 2013), we applied and refined that standard. There, wé found insufficient evidence' in the record to raise the inference that the applicant was personally involved in the alleged persecution. Id. at 999-1000. Thus, we remanded for further factfinding. Id. at 1000. Although the applicant in Kumar testified that he worked at an interrogation facility in which people were persecuted, there was no evidence to indicate either that he took part in any'interrogations or that he was personally present during the alleged persecution. Id. at 998-99. Further, the evidence indicated only that the applicant’s work assisted the operation of the facility; there was no evidence indicating that the work directly assisted in the persecution of others. Id. Faced with these evidentiary gaps, we did not hold — as the government would have us do here — that the persecutor bar should apply because the applicant failed affirmatively to provide evidence rebutting the circumstantial evidence suggesting that he might have assisted in persecution. Id. Rather, by remanding for further fact-finding, we required a threshold showing that each element of the persecutor bar could be met.[5] Likewise, in the context of *1049 the terrorist bar, the record evidence must raise the inference that each element of the terrorist bar could be met before the applicant’s burden of proof arises.
It is unreasonable to expect applicants for withholding of removal and other forms of relief to anticipate what bars might apply to their case, and then to affirmatively rebut all of those bars. Such a requirement would also be contrary to the language of the regulations, which assume that the record will contain at least some evidence indicating that a bar applies before the applicant has the burden to disprove it. See 8 C.F.R. § 1208.16(d)(2); id, § 1240.8. Indeed, a threshold evidentiary showing is especially important in the terrorism context, where the definition of a terrorist organization, and terrorist activity, is unusually broad. See In Re S-K-, 23 I. & N. Dec. 936, 948-50 (BIA 2006) (Osu-na, Acting V. Chairman, concurring) (discussing the “breathtaking ... scope” of the statutory language). There must be some initial showing that each element of the statute could be met. Otherwise, we risk rejecting applicants who are in all other respects eligible for relief simply on the basis of a vague association .with religious or political fundamentalism.
In the persecution context, we have found evidence that an individual worked at a facility where people were persecuted to be insufficient to indicate that the bar might apply. Similarly, to invoke the terrorist bar, it is not enough for the government simply to assert that an individual was involved with a radical political or religious group. Rather, the record evidence must raise the inference that each element of the bar applies. In this case, there must be some evidence indicating that all of the following is true: that the alleged terrorist group consisted of two or more people, who engaged in one of six enumerated “terrorist activities,” and that the applicant for relief actually knew of this activity when he provided material support to the group. This framework is consistent with our cases applying the persecution bar, as described above. The framework is also consistent with the Board’s decisions applying the terrorist bar. See id. at 939, 941 (finding evidence that an alleged' terrorist organization “use[d] firearms and/or explosives to engage in combat” with the Burmese government sufficient to raise an inference that the bar applied); In Re R-S-H, 23 I. & N. Dec. 629, 640 (BIA 2003) (noting with approval that the government “produced significant evidence , to support its position” that the terrorist bar applied).
B. Application to Budiono .
For the terrorist bar to apply, the IJ was required to find that the JMA used “any ... explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain)” in pursuit of its goais. 8. U.S.C. § 1182(a)(3)(B)(iii)(V)(b). The IJ failed to do so.
The JMA is apparently unknown to the U.S. government. Thus, the only available evidence of the JMA’s activities is the tes *1050 timony of Budiono and his wife.[6] That testimony contains no reference to the JMA ever using weapons. Whenever Budiono recalled his own violent persecution by the JMA, he consistently described being “beaten.” Budiono’s wife also testified that the JMA beat her husband. When asked how the JMA beat him, Budiono said, “They pushed me and then they hit my head and also my stomach.” Budiono never mentioned the use of any weapon.
Budiono also consistently testified that the JMA used “force” against him and others to promote their radical beliefs. Bu-diono did not explain what the “force” entailed, but he also used the word “force” to describe the physical beatings he received from JMA members and the police. Budiono only reported being hit and pushed during these beatings. Thus, nothing in Budiono’s testimony suggests that the JMA used weapons against their targets. Rather, the evidence only raises the inference that the JMA physically beat such individuals.
The government contends that the IJ could infer that the JMA utilized weapons based on the participation of some JMA members in the Jakarta riots. But Budiono never mentioned weapons in relation to the Jakarta riots. Nor did the government introduce any news articles, reports, or other evidence indicating that the Jakarta rioters wielded weapons. The bare fact that many people were killed during the riots does not suffice to show that members of the JMA, specifically, used weapons during the riots.
In cases where we have upheld the Board’s application of the terrorist bar, there was much stronger evidence that the organization met the statutory requirements for terrorist activity. See, e.g., Bojnoordi v. Holder, 757 F.3d 1075, 1078 (9th Cir. 2014) (discussing evidence that the organization “assassinated six United States nationals” in addition to staging attacks inside Iran and killing United States military personnel and civilians working on defense projects); Khan v. Holder, 584 F.3d 773, 778 (9th Cir. 2009) (discussing evidence that the organization engaged in “killings, bombings, and attacks on convoys”). By contrast, the JMA’s participation in the Jakarta riots does not raise the inference that the JMA, as an organization, used weapons in pursuit of its goals. Likewise, the fact that the JMA beat Budiono after he expressed disagreement with their beliefs says nothing about whether the JMA employed weapons. Cf. Kumar, 728 F.3d at 999 (holding that evidence that an applicant worked at a facility where persecution occurred was insufficient to show that the applicant was personally involved in persecution).
In sum, the record supplies no evidence raising the inference that the JMA was a terrorist organization as defined by § 1182(a)(3)(B)(iii). Rather, all of the available evidence indicates the opposite — that the JMA either did not have access to or preferred not to use weapons. Based on this evidence, the IJ determined that the JMA was a terrorist organization because its members “harmed, threatened with bodily harm, and/or damaged property, and ... such harm was directed toward non-Muslims and/or the government....” These are not the statutory elements of a terrorist organization. The Board recognized this insufficiency on Budiono’s first appeal and specifically instructed the IJ to “reconsider the issue of [Budiono’s] eligibility based on his alleged material support *1051 for a terrorist organization” because “[t]he [IJ’s] conclusion on that issue is not supported by sufficient findings of fact regarding whether the group is a terrorist organization, and the respondent’s precise role in such group.” The IJ failed to do so, relying on exactly the same testimony the second time to find that the JMA was a terrorist organization.
Based on the foregoing, we conclude that no evidence in the record supports the IJ’s finding that the JMA is a terrorist organization; therefore, the Board erred in denying Budiono’s application for relief under the terrorist bar.
y.
The Board has twice considered whether Budiono was barred from relief by his material support of the JMA. Both times, the evidence was insufficient to support application of the bar. Indeed, after conducting a second round of hearings, the IJ was unable to uncover any additional evidence of the JMA’s activities. Thus,' we conclude that the terrorist bar does not apply to Budiono.[7]
“Remand is not appropriate when the [Board] addressed an issue and its opinion is reversed.” Retuta v. Holder, 591 F.3d 1181, 1189 n.4 (9th Cir. 2010). The IJ concluded on remand that, but for application of the terrorist bar, Budiono was eligible for withholding of removal. The Board upheld that determination on appeal. Thus, because we conclude the terrorist bar does not apply to Budiono, we must conclude that he is eligible for withholding of removal.
We therefore GRANT Budiono’s petition for review, REVERSE the order of removal, and REMAND to the Board for further proceedings consistent with this opinion.

. Because the IJ found Budiono’s testimony in hearings held prior to the 2006 decision to be credible, we must accept it as true. See Halaim v. INS, 358 F.3d 1128, 1131 (9th Cir. 2004).

. The Board did not address Budiono's eligibility for CAT relief in its 2008 decision.

. The Board also affirmed the IJ’s 2006 denial of CAT relief.

. We lack jurisdiction to review a determination that an asylum application was untimely, 8 U.S.C. § 1158(a)(3), unless the petition for review raises constitutional questions or questions of law, id. § 1252(a)(2)(D). In his 2006 decision, the IJ squarely rejected Budiono’s argument that his friend’s death constituted changed circumstances. This is a conclusion of law. Accordingly, we -have jurisdiction to review it.

. This requirement is not unique to the Ninth Circuit. See Diaz-Zanatta v. Holder, 558 F,3d 450, 460 (6th Cir. 2009) (requiring evidence that the applicant, who collected and relayed information used to persecute individuals, had "prior or contemporaneous knowledge” of how that information was used): Xu Sheng Gao v. U.S. Atty. Gen., 500 F.3d 93, 100 (2d Cir. 2007) (“Before Gao may be held personally accountable .... there must be some evidence that he himself engaged in conduct that assisted in the persecution of another.”).
We note that, in cases applying the resettlement bar, the applicant bears the burden of proving the bar does not apply only upon the government’s submission of specific documents to-the IJ. The government "bears the *1049 initial burden of showing that the government of the third country issued to the alien a formal offer of some type of official status permitting the alien to reside in that country indefinitely.” Su Hwa She v. Holder, 629 F.3d 958, 962 (9th Cir. 2010) (quoting Maharaj v. Gonzales, 450 F.3d 961, 976 (9th Cir. 2006)). Only when the government has provided this evidence does "the burden shift[] to the alien to show, by a preponderance of the evidence” that the resettlement bár does not apply. Id., see also, e.g., Tchitchui v. Holder, 657 F.3d 132, 135 (2d Cir. 2011); Firmansjah v. Gonzales, 424 F.3d 598, 602 (7th Cir. 2005); Abdille v. Ashcroft, 242 F.3d 477, 491 (3d Cir. 2001).

. Because the IJ relied solely on testimony from the first hearing in 2006 to support his conclusion on remand that the JMA was a terrorist organization, that is the evidence we consider on this petition for review.

. Because we conclude that Budiono qualifies for withholding of removal, we do not address his CAT claim.