**NOT FOR PUBLICATION**

FILED

UNITED STATES COURT OF APPEALS

SEP 29 2020

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| MARIO ROLANDO RODAS, | No. 17-70311 |
| Petitioner, | Agency No. A070-780-893 |
| v. | |
| WILLIAM P. BARR, Attorney General, | MEMORANDUM[*] |
| Respondent. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 13, 2020
Pasadena, California

Before: SCHROEDER, BYBEE, and COLLINS, Circuit Judges.

Mario Rolando Rodas ("Rodas"), a native and citizen of Guatemala,

petitions for review of the decision of the Board of Immigration Appeals ("BIA")

affirming the decision of the immigration judge ("IJ") denying his request for

"special rule cancellation of removal" under the Nicaraguan Adjustment and

Central American Relief Act ("NACARA"), Pub. L. No. 105-100, title II, 111 Stat.

2193 (1997), and ordering him removed. The BIA concluded that Rodas was

---

[*] This disposition is not appropriate for publication and is not precedent except as
provided by Ninth Circuit Rule 36-3.

subject to the "persecutor bar," a provision of the Immigration and Nationality Act ("INA") that bars certain types of relief for aliens who have "ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(B)(i); *see also* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") § 309(f)(1)(B)(ii), as added by NACARA § 203(b), 111 Stat. at 2198, 8 U.S.C. § 1101 note (applying the persecutor bar to NACARA's special rule cancellation of removal).[1] We have jurisdiction under § 242 of the INA, 8 U.S.C. § 1252. We review the BIA's legal conclusions de novo, and we review the agency's factual findings for substantial evidence. *Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019).

The BIA upheld the IJ's application of the persecutor bar based on actions taken by Rodas while he was a member of Guatemala's Treasury Guard during the country's civil war in the 1980s. Specifically, the BIA stated that Rodas had policed anti-government political protests, where he "arrest[ed] some of the

[1] NACARA's special rule allows specified aliens to obtain cancellation of removal "under section 240A" of the INA under criteria that differ in certain respects from those that would normally apply under that section. *See* IIRIRA § 309(f)(1). However, NACARA explicitly incorporates the very same persecutor bar that ordinarily applies to any application for cancellation of removal under INA § 240A. *See* INA § 240A(c)(5), 8 U.S.C. § 1229b(c)(5) (an alien "who is described in section 1231(b)(3)(B)(i) of this title" is ineligible for cancellation of removal under § 240A).

protesters and turn[ed] them over to the authorities." The BIA concluded that the record supported the view that, while Rodas did "not know what happened to any of the individuals he arrested at the protests, . . . he knew that some of the individuals arrested were beaten and killed after being turned over to the authorities." On that basis, the BIA held that, under the applicable regulations, the IJ correctly shifted the burden to Rodas to show that the persecutor bar does not apply. We conclude that there is no substantial evidence to support the BIA's conclusion that some of the protestors that Rodas arrested were beaten or killed after being turned over to authorities. We therefore grant Rodas's petition for review.

1. Under the applicable regulations governing Rodas's application for special rule cancellation, if the record evidence "indicates that one or more of the grounds for mandatory denial of the application for relief"—such as the persecutor bar—"*may* apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds *do not* apply." 8 C.F.R. § 1240.8(d) (emphasis added). In order to shift the burden to the applicant, the record must contain "particularized evidence of the bar's applicability"—that is, evidence sufficient to "raise the inference that each element of the bar applies"—"before placing on the applicant the burden to rebut it." *Budiono v. Lynch*, 837 F.3d 1042, 1048–49 (9th Cir. 2016). Here, because the statute only applies the persecutor bar to an alien

3

who "ordered, incited, assisted, or otherwise participated in the persecution of *an individual* because of *the individual's*" relevant characteristics, 8 U.S.C. § 1231(b)(3)(B)(i) (emphasis added), the statutory text confirms that the persecutor bar applies only if the alien was involved in an identifiable instance of persecution of an identifiable individual. On the facts of this case, in which Rodas's alleged participation consisted solely of the arrests he made, the Government's initial burden therefore was to show that the record contained sufficient "particularized evidence" that, *inter alia*, at least one of Rodas's arrestees was in fact tortured after Rodas arrested that person. *Budiono*, 837 F.3d at 1048. As we shall explain, there is no such evidence in the record.

2. In concluding that the Government's initial burden had been met, the BIA relied on Rodas's oral testimony at the hearing, which the IJ had specifically found to be credible "in all aspects." Although the BIA correctly observed that the notes of Rodas's prior interviews with immigration officials were not relied upon by the IJ as substantive evidence, the BIA acknowledged that they had been used for impeachment. Indeed, the record confirms that Rodas's hearing testimony *about* those notes formed the loadbearing evidence on which the IJ rested his finding that the Government had met its threshold burden concerning the persecutor bar. Accordingly, we first summarize what the notes stated before turning to Rodas's testimony.

4

a.  Rodas's application was handled by at least two asylum officers.  The first asylum officer to interview Rodas, Leslie Badin, spoke with him on December 14 and 18, 2000.  Badin's handwritten notes from the first interview are in the record, and they provide, *inter alia*, the following information.  Rodas acknowledged that he served as a member of the Treasury Guard from 1985 until early 1989.  He stated that, while he was never involved in military operations, he and other Treasury Guard officers would "help the army" by "notify[ing] them of the guerrillas."  He explained that his duties as a Treasury Guard member were "basically what policemen do here" in the United States.  After that answer, he and Badin had the following exchange, as paraphrased in Badin's handwritten notes:

Q:    Did you ever apprehend any people?
A:    I have detained people with drugs in cars—a couple of times.
Q:    Did your unit ever capture guerrillas?
A:    Yes my unit did, but I never did.  Only the military would capture them.
Q:    What would happen to these people?
A:    I do not know, they would be in the hands of the army.
Q:    Do you have [an] idea as to what happened to the prisoners?
A:    They would get tortured and also, if the guerrillas ever captured one of us—they would do the same—torture and kill us.
Q:    Did you yourself ever harm anyone else?
A:    No.  I have never harmed anyone else.

In preparing a typewritten memorandum about the interview, Badin "concluded that [Rodas] assisted in persecution of others because he knew what would happen to the people when he turned them over to the army."  As the notes show, "the people" that were turned over to the army were guerrillas, not arrested civilians,

5

and the individuals who seized those persons were others in Rodas's unit and not Rodas himself. Badin's memorandum and notes do not mention anything about protests or arresting protesters.

The second asylum officer to handle Rodas's case, Leon DeHaven, generated a longer memorandum dated December 13, 2001. Among other things, the memorandum summarizes an interview with Rodas. According to that summary, Rodas stated that he was required to control demonstrations and break them up. He stated that "other officers would beat the demonstrators after the demonstration was over" and that a "couple of times, his Sergeant told him to beat the demonstrators," which, although he "did not want to do this, he did because he felt he had to in order to protect his job." He also acknowledged that civilians would sometimes give him "information" about guerrillas, and he would pass that information along to the army. According to the memorandum, Rodas "was aware that these people"—the immediate antecedent being the *guerrillas*—"would be beaten and killed but he had to turn over the information as it was part of his job." DeHaven's handwritten notes from the same date also appear in the record, and the contents match the summary in his memorandum. DeHaven's memorandum ultimately concludes that the persecutor bar applies to Rodas, but for a different reason that Badin: DeHaven concluded that Rodas participated in persecution because he participated "in the beating of individuals who were protesting against

6

the government on account of their political opinions." The memorandum does not state that protesters were ever tortured or killed.

Finally, there is a third memorandum in the record, though it is unsigned and undated. The IJ described it at one point as a memorandum "from Homeland Security" regarding a previous interview with Rodas. According to the memorandum, Rodas "testified that on four occasions he was called to arrest protesters against the government." He acknowledged that he used force to make the arrests but did not acknowledge beating any protesters. He stated that he turned over the arrested protesters to "local civil authorities" and that he did not know what happened to the protesters from there.

In sum, the contents of these memoranda and notes show that Rodas turned over information about guerrillas to the army, that others in Rodas's unit captured some guerrillas and turned them over to the army, and that guerrillas in the army's custody would be tortured and killed. Rodas separately acknowledged that he policed anti-government protests, that he used force against and may have beaten the protesters *during* the demonstrations, that he arrested some of them, and that he turned arrested protesters over to civil authorities. There is no suggestion in any of these memoranda that Rodas ever turned over protesters to the army or that civil authorities ever tortured or killed the protesters that Rodas arrested.

b. During direct examination at his first substantive hearing, Rodas testified

7

that he had arrested people and that he "would take them to court," where "the judge would take over or the authorities would take over." He denied that any of his arrestees were ever tortured, and he denied ever arresting any guerrillas.

On cross-examination, government counsel repeatedly asked Rodas questions about his previous statements without clarifying the distinction between protesters and guerillas. Government counsel first asked Rodas whether "you told the Asylum Officer that you beat protesters," an apparent reference to DeHaven's memorandum. Rodas denied that he had said that. Instead, Rodas claimed that he had done nothing more than push protesters back or hold them off. The IJ then took over questioning, and asked "how do you know there were guerrillas in the crowd?" Rodas appeared confused by the question: "The rallies was [sic] against the government. The guerrillas—those were during the confrontations."

When government counsel resumed the examination, he asked Rodas what would happen to the people he arrested. Rodas responded, "we would turn them in to the authorities," but Rodas denied that he knew what would happen to them from there. Although government counsel had been discussing protesters up until that point, government counsel attempted to impeach Rodas using Badin's notes,[2] which refer to guerrillas but not protestors. Government counsel read Badin's

_____

[2] Neither the IJ nor Rodas's counsel had seen the notes before, and Rodas's counsel failed to accept the IJ's repeated offer of a continuance.

question, "what happened to [the] prisoners?" and Rodas's answer, "They would get tortured." Government counsel failed to read the previous questions from Badin's notes, which make clear that "the prisoners" referred to were guerrillas captured by others in Rodas's unit. Based on government counsel's misleading line of questioning, the IJ (who, again, had not seen the notes before) was laboring under the impression that government counsel was speaking of people Rodas arrested at demonstrations, and he asked Rodas, "Who would you hear that from that people who were in the demonstrations or rallies would be tortured?" Rather than let Rodas answer, Rodas's attorney tried to clear up the misunderstanding, stating, "Your Honor, I think that [testimony] was referring to guerrillas." The IJ did not acknowledge Rodas's counsel's point.

After some discussion, government counsel resumed questioning, asking Rodas, "do you remember telling the Asylum Officer that you knew these people would be beaten and killed, but you had to . . . turn them over anyway, because it was part of your job?" Rodas answered, "Yes." The question does not specify who "these people" are or to whom they were turned over, but the answer is clear in light of what is stated in the memorandum to which government counsel referred. The reference is to a statement recounted in DeHaven's memorandum: "The applicant was aware that these people would be beaten and killed but he had to turn over the information as it was part of his job." As the memorandum makes

clear, however, that "information" was "about guerrillas" and was being passed on "to the Army." Thereafter, when the IJ attempted to clarify Rodas's answer—but still without specifying whether the subject was protesters or guerrillas—Rodas attempted to explain what he had actually said, stating, "I would just arrest[] them and turn them over to the justice—to the authorities."

Rodas's second substantive hearing did not clear up the misunderstanding. Rodas had a new attorney, who revisited the topic of anti-government protesters. Rodas testified on direct examination that, after he arrested protesters, he would bring them "to the police station," where "the law will take care of them." On cross-examination, government counsel disputed that answer, stating, "You said at the prior hearing that you turned them"—protestors—"over to the army." Rodas had said nothing of the kind, and he correctly denied giving that testimony.

At a third substantive hearing, government counsel called Badin to testify. Badin stated that he had made his initial decision to deny relief because he concluded that Rodas had turned people over to the army, knowing that they would be harmed. But as explained earlier, Badin's notes did not say that Rodas had turned people over to the army; they said that *others* in the unit had done so, but that Rodas had not. As Badin's notes make clear, Rodas admitted only to passing along *information* about guerrillas to the army, not actual detainees. Government counsel asked Badin to read the portion of his handwritten notes in which he asked

10

Rodas "what happened to the prisoners?" and to which Rodas had answered, "They would get tortured." But in directing Badin's attention to that question, government counsel skipped the earlier questions in Badin's handwritten notes that confirmed that "the prisoners" referred to guerrillas captured by Rodas's unit and not to arrestees at civilian protests.

3.  As explained earlier, the basis of the BIA's decision was that Rodas had testified that he knew that "some" of "the individuals *arrested at the protests*" were subsequently "beaten and killed after being turned over to the authorities" (emphasis added). As we have explained, Rodas did not say that. The BIA crossed wires, as government counsel incorrectly did at the hearing, between what Rodas said about civilian protestors and what he said about guerrillas. Neither the BIA nor the IJ pointed to any other evidence indicating that any of the civilians arrested by Rodas were subsequently tortured or persecuted. Moreover, the BIA acknowledged that Rodas himself "never harmed, tortured, or killed anyone at the protests," and that he had only used "the necessary force to arrest some of the protestors." On this record, there is no substantial evidence to support the BIA's view that the Government carried its initial burden to show the applicability of the persecutor bar, and that bar therefore provides no grounds for denying cancellation of removal to Rodas.[3]

---

[3] Neither the IJ nor the BIA relied on a theory that Rodas's turning over of

11

Because the IJ has already determined that Rodas is otherwise statutorily eligible for special rule cancellation of removal, the sole remaining issue in this long-running matter is whether Rodas merits a favorable exercise of discretion. *See generally Monroy v. Lynch*, 821 F.3d 1175, 1176 (9th Cir. 2016) (discussing the discretionary nature of NACARA benefits).

The petition for review is **GRANTED** and the case is **REMANDED** for further proceedings consistent with this memorandum.

---

information about guerrillas to the army provided a basis for invoking the persecutor bar, and we cannot uphold the BIA's decision on that basis. *See Budiono*, 837 F.3d at 1046 ("Our review is limited to those grounds explicitly relied upon by the Board.").