**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| C.J.L.G., A JUVENILE MALE,<br>*Petitioner*,<br><br>v.<br><br>JEFFERSON B. SESSIONS III,<br>Attorney General,<br>*Respondent*. | No. 16-73801<br><br>Agency No.<br>A206-838-888<br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted August 8, 2017
Pasadena, California

Filed January 29, 2018

Before:  Consuelo M. Callahan and John B. Owens,
Circuit Judges, and David A. Faber,[*] District Judge.

Opinion by Judge Callahan;
Concurrence by Judge Owens

---

[*] The Honorable David A. Faber, United States District Judge for the Southern District of West Virginia, sitting by designation.

# SUMMARY[**]

## Immigration

The panel denied C.J.L.G.'s petition for review of a Board of Immigration Appeals decision, holding that neither the Due Process Clause nor the Immigration & Nationality Act creates a categorical right to court-appointed counsel at government expense for alien minors, and concluding that the Board's denial of asylum, withholding of removal, and relief under the Convention against Torture was supported by substantial evidence.

The panel held that it is not established law that alien minors are categorically entitled to government-funded, court-appointed counsel and, applying the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), held that C.J. had not shown a necessity for such counsel to safeguard his due process right to a full and fair hearing.

The panel incorporated its analysis of C.J.'s asylum claim into its *Mathews* analysis in determining that C.J. was not prejudiced by any procedural deficiencies in his proceeding. The panel concluded that the record compelled a finding that C.J. had a well-founded fear of persecution based on threats he received from the Mara gang when he resisted their recruitment efforts, but rejected C.J.'s asylum claim because he had not established that the threats had a nexus to a protected ground, or that the government was unable or unwilling to control the Maras. The panel deemed waived

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

any argument that he was denied due process on his withholding and CAT claims, but noted that his withholding claim would also fail.

The panel also rejected C.J.'s argument that the INA's fair hearing provision, § 1229a(b)(4)(B), implicitly requires court-appointed counsel at government expense for all alien minors.

The panel further held that the IJ was not required to inform C.J. that he might be eligible for Special Immigrant Juvenile status, concluding that the IJ's duty to inform aliens of "apparent eligibility" for relief was not triggered because, at the time of his removal proceeding, C.J. did not have a state court order that could have made him apparently eligible for SIJ status.

Finally, the panel concluded that the agency's denial of CAT relief was supported by substantial evidence. The panel concluded that 1) the Board did not err in concluding that C.J.'s experience of having a member of the Maras put a gun to his head did not amount to "severe pain or suffering;" 2) there was no showing that the Honduran government acquiesced in the act; and 3) the record did not compel the conclusion that the government either turned a blind eye to the Maras' threats or that it would be unable or unwilling to control the Maras in the future.

Concurring, Judge Owens wrote that the majority's opinion does not hold, or even discuss, whether the Due Process Clause mandates counsel for *unaccompanied* minors, and observed that that is a different question that could lead to a different answer.

**COUNSEL**

Ahilan Thevanesan Arulanantham (argued), ACLU Foundation of Southern California, Los Angeles, California; Stephen Kang, ACLU Immigrants' Rights Project, San Francisco, California; Matt Adams and Glenda M. Aldana Madrid, Northwest Immigrant Rights Project, Seattle, Washington; Theodore J. Angelis and Aaron E. Millstein, K&L Gates LLP, Seattle, Washington; Kristen Jackson and Talia Inlender, Public Counsel Law Center, Los Angeles, California; Kristin Macleod-Ball, National Immigration Project of the National Lawyers Guild, Boston, Massachusetts; Melissa Crow and Karolina Walters, American Immigration Council, Washington, D.C.; Emily Chiang, ACLU of Washington, Seattle, Washington; for Petitioner.

Kiley L. Kane (argued), Senior Litigation Counsel; Stephen J. Flynn, Assistant Director; Chad A. Readler, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

John E. Schreiber and Nareeneh Sohbatian, Winston & Strawn LLP, Los Angeles, California, for Amicus Curiae Immigrant Legal Resource Center.

Blaine Bookey, Karen Musalo, and Eunice Lee, San Francisco, California, as and for Amicus Curiae Center for Gender & Refugee Studies.

Robert A. Brundage and Lucy Wang, Morgan Lewis & Bockius LLP, San Francisco, California; Daniel Grunfeld, Morgan Lewis & Bockius LLP, Los Angeles, California; for Amici Curiae Dr. Jennifer Woolard and Dr. Laurence Steinberg.

## OPINION

CALLAHAN, Circuit Judge:

"The right to counsel in immigration proceedings is rooted in the Due Process Clause [of the Fifth Amendment] and codified at 8 U.S.C. § 1362 and 8 U.S.C. § 1229a(b)(4)(A) [of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101, et seq.]."[1] *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005). Sections 1362 and 1229a(b)(4)(A) set forth the scope and contours of this right, providing that the alien "shall have the privilege of being represented (at no expense to the Government) by such counsel . . . as [the alien] shall choose." 8 U.S.C. § 1362; *see also* 8 U.S.C. § 1229a(b)(4)(A) (substantially the same); 8 C.F.R. § 1240.10(a)(1)–(2).

We have held that a corollary of this privilege is an immigration judge's ("IJ") duty to inform an alien of his right to counsel, and to ensure that any decision to waive that right be knowing and voluntary. *See, e.g.*, *Montes-Lopez v. Holder*, 694 F.3d 1085, 1088 (9th Cir. 2012); *Baltazar-*

---

[1] Because removal proceedings are civil rather than criminal in nature, aliens' right to counsel derives from the Constitution's Fifth Amendment rather than the Sixth Amendment. *Magallanes-Damian v. INS*, 783 F.2d 931, 933 (9th Cir. 1986).

*Alcazar v. INS*, 386 F.3d 940, 945 (9th Cir. 2004); *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1027 (9th Cir. 2004); *United States v. Ahumada-Aguilar*, 295 F.3d 943, 947 (9th Cir. 2002). But we have been careful to limit that right to Congress' express prescription.[2] Ever vigilant of the judiciary's restricted role in reviewing matters of immigration policy, we have heeded the Supreme Court's admonition that the "'power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments *largely immune from judicial control.*'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (emphasis added) (quoting *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953)). Consistent with this recognition, "courts have uniformly held in this circuit and elsewhere that . . . [aliens] are not entitled to have counsel appointed at government expense." *United States v. Gasca-Kraft*, 522 F.2d 149, 152 (9th Cir. 1975), *overruled on other grounds by United States v. Mendoza-Lopez*, 481 U.S. 828, 834 n.9 (1987) (collecting cases).

Petitioner C.J.L.G. ("C.J.") asks us to upend Congress' statutory scheme by reading into the Due Process Clause and the INA itself a categorical right to court-appointed counsel *at government expense* for alien minors. C.J. also argues that, in his removal proceeding before the IJ, the IJ erred by failing to inform him of his possible eligibility for Special Immigrant Juvenile ("SIJ") status. Finally, C.J. insists that, on the merits, the IJ and the Board of Immigration Appeals ("Board") erred in denying his claims for asylum,

---

[2] *Cf. Flores v. Sessions*, 862 F.3d 863, 875–76 (9th Cir. 2017) (relying on the terms of two immigration statutes to determine the scope of an unaccompanied alien minor's right to a bond hearing before an immigration judge).

withholding of removal, and relief under the Convention Against Torture ("CAT").

C.J. petitions for review of the Board's determination affirming the IJ's decision, and requests a remedy in the form of court-appointed counsel at government expense for himself and all similarly situated alien minors. He seeks court-appointed counsel both for a new removal proceeding before the IJ, and for purposes of pursuing his application for SIJ status, a related but separate legal journey that begins in California state court.

Because we hold that neither the Due Process Clause nor the INA creates a categorical right to court-appointed counsel at government expense for alien minors, and because we conclude that the Board's determination on the merits is supported by substantial evidence, we deny C.J.'s petition.[3]

## I.

### A.

C.J. is a sympathetic petitioner. A native and citizen of Honduras, he repeatedly spurned the Mara gang's entreaties to join its ranks despite death threats made against him and his family. After the Maras threatened C.J. at gunpoint, C.J. and his mother, Maria, fled Honduras.

---

[3] C.J.'s request for judicial notice, Dkt. No. 59, is **GRANTED**. *See* Fed. R. Evid. 201.

On June 21, 2014, C.J. and Maria arrived in the United States without inspection.[4] C.J. was 13 years old at the time. The Department of Homeland Security ("DHS") apprehended C.J. and Maria four days later, and served Maria with a notice to appear ("NTA") for C.J. Maria signed the NTA on behalf of her son. DHS provided Maria with a list of organizations that provide *pro bono* legal services.

In September 2014, DHS placed C.J. in removal proceedings in Los Angeles based on his illegal entry into the United States. C.J. appeared for his November 25, 2014 hearing with Maria but without legal representation, as he would for each of his hearings before the IJ. The government was represented by counsel at all of the hearings. Because neither Maria nor C.J. speaks English, an interpreter was provided.

**B.**

At the November 2014 hearing, the IJ informed Maria that her son had "the right to have an attorney" at private expense. When Maria told the IJ that she did not have money for an attorney, the IJ told her that she had "two options": "Either we can go forward and you can speak and represent your son here today," or "I can continue your case to another day" to give Maria time to secure counsel. Maria accepted the IJ's offer to continue the case.

---

[4] Maria had previously entered the United States without inspection and was already subject to a removal order when she re-entered the country with C.J. Maria has been placed in a separate removal proceeding.

At the next hearing, held on January 25, 2015, Maria told the IJ that she had "looked for an attorney and they are charging me $6,500 for each one, so I could not afford that amount." The IJ then ordered a three-month continuance, but told Maria that it would be the last one, and that, if she returned without an attorney, C.J.'s case would go forward.

The third hearing was held on April 24, 2015. Because Maria had still not retained counsel, the IJ told her that she would proceed with the case and that Maria could "represent your son here today." Maria said that she understood. The IJ then told Maria and C.J. that they had the right to present documents and other evidence, and could review and object to the government's evidence. The IJ also told them that they could call witnesses and question the government's witnesses.

The IJ then went over the NTA with Maria. Maria conceded the allegation that C.J. had unlawfully entered the United States because he was not admitted or paroled. The IJ therefore found C.J. removable. The IJ then proceeded to ask Maria several questions about C.J., in the course of which Maria stated that C.J.'s father had left them "a long time ago." The IJ then asked Maria if C.J. had a "fear of returning back to Honduras because of his race or religion or nationality or political opinion or membership in a social group." Maria answered: "Yes, because of the gangs." The IJ responded: "Ma'am, I will tell you right now that most likely that is not going to be a reason for [C.J.] to remain in the United States."

The IJ then gave Maria an asylum form to complete. The IJ again told Maria that she could continue looking for an attorney to represent C.J. in his removal proceedings. When the IJ asked Maria if she had any questions, Maria said:

"[T]ell me about the asylum."  The IJ responded: "Well, we don't need—you mean about why the fear or what happened?"  Maria replied: "Well, yes, I am fearful to have my child return to Honduras."  To which the IJ said: "Okay. Well, that's what you can put in all the applications and bring that back."

Maria filed the asylum application at the next hearing, held on June 29, 2015.  The application contains threadbare statements in support of C.J.'s asylum claim and much of what is written is borderline inscrutable and non-responsive.[5] Nevertheless, after reviewing the application, the IJ stated: "Everything looks to be okay at this point, so I'm going to go ahead and accept the application."  The IJ then set the case for one more hearing, and reiterated to Maria that she could still try to hire an attorney.  The IJ also provided Maria with a 2014 State Department country conditions report for Honduras, which was in English.

The proceeding reconvened on February 29, 2016.  C.J. was still unrepresented.  The IJ asked Maria if she would be "assisting [C.J.] as you've been doing in the past," and she said that she would.  The IJ then asked C.J. questions under oath regarding his background and asylum application.  The IJ asked C.J. if he had had any contact with his father, and C.J. confirmed that he had not for many years.  After admitting into the record C.J.'s asylum application, his birth certificate, and the country report, the IJ asked C.J. about his fear of returning to Honduras.  C.J. testified that the Mara

---

[5] For example, in response to the question whether C.J. has ever caused harm or suffering to another based on a protected ground, the application states: "THE GAN'S TOLD ME I HAVE TO KILL A PEOPLE TO BE AND THE GAN'S."

gang had approached him three times in an effort to recruit him. Each time he refused, and the Maras threatened to kill him if he did not join. C.J. was not physically harmed, but during the third confrontation a gang member put a gun to C.J.'s head and gave him one day to decide whether to join. This escalation was apparently prompted by the gang's discovery that C.J. had told his mother about its recruitment efforts. The Maras also threatened to kill C.J.'s mother, aunt, and uncles. C.J. and his mother fled Honduras that same day. C.J. testified that he was afraid to return to Honduras "[b]ecause if I arrive there [the Mara gang] will kill me."

The IJ then asked C.J.—who was 13 years old when he left Honduras—whether he had "tr[ied] to live anywhere else in Honduras," to which C.J. responded: "No." The IJ also asked C.J. if he had asked the police for help, to which he replied: "No, they couldn't do anything." When pressed, C.J. stated that he was "very afraid."

The DHS attorney did not ask C.J. any questions or call any witnesses. The IJ then asked Maria if there was "anything that you want to tell me regarding your son and why you're fearful if he returns back to Honduras or anything else you believe he didn't tell me." Maria replied: "No, that's all. I—I'm very afraid to go back. I don't—I'm afraid that something will happen to my child." The IJ then said: "And is that why you came to the United States, because [C.J.] was being threatened by the gangs?" Maria replied: "Yes."

## C.

The IJ issued a written denial of C.J.'s application for asylum, withholding of removal, and CAT relief. The IJ found C.J. to be credible, and determined that his fear of

returning to Honduras was subjectively reasonable. But she held that C.J. lacked an objectively reasonable basis for asylum relief. First, C.J. failed to show that he had suffered harm tantamount to persecution. Second, C.J. did not show "credible, direct and specific evidence . . . that would support an objectionably [sic] reasonable fear of [future] persecution should he return to Honduras." Third, C.J. had not established membership on the basis of a protected ground. And fourth, C.J. failed to show that the government was unable or unwilling to control the Maras. Because C.J. could not establish eligibility for asylum, the IJ concluded that his withholding of removal claim—which sets a higher standard for showing persecution than asylum—necessarily failed. The IJ also rejected C.J.'s CAT claim on the ground that "[C.J.] has failed to meet his burden in showing that there is anyone in Honduras that would seek to torture him, but [sic] certainly no one with the acquiescence of the Honduran government."

C.J. filed an appeal with the Board and retained counsel. He argued that the IJ erred in denying relief. He also argued that the IJ conducted a procedurally defective hearing that violated his due process rights. Specifically, he asserted that the IJ (i) failed to advise him of available forms of relief, in particular SIJ status; (ii) failed to develop the record; and (iii) erred in not appointing counsel for him.

On November 1, 2016, the Board dismissed the appeal in a decision that affirmed the IJ's analysis and conclusion. The Board held that the Maras' threats did not rise to the level of persecution, that C.J. lacked a well-founded fear of future persecution, and that C.J. was not a member of a cognizable social group that could confer protected status for purposes of

asylum and withholding relief. The Board denied C.J.'s CAT claim as unsupported.

The Board also rejected C.J.'s due process arguments. It held that the IJ had conducted a "fair" hearing and "objectively considered [C.J.'s] testimony and the documentary evidence in the record." It further found that the IJ did not err in failing to advise C.J. of possible SIJ status because C.J. had not—by the time of the appeal—"established . . . that he is eligible for other forms of relief." Finally, the Board rejected C.J.'s appointed counsel claim, holding that the INA and relevant regulations "do not require that counsel ever be appointed at government expense in removal proceedings." C.J. timely filed a petition for review in this court.

## II.

We have jurisdiction to review the Board's final order of removal under 8 U.S.C. § 1252(a)(1). We review de novo C.J.'s legal claims that he was denied a right to court-appointed counsel at government expense, that the IJ failed to conduct a full and fair hearing, and that the IJ erred in not informing C.J. of possible SIJ status. *Jie Lin*, 377 F.3d at 1023; *see also Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1096 (9th Cir. 2004) (applying de novo review to both "purely legal questions" and "due process challenges"). We review factual findings for substantial evidence. *Budiono v. Lynch*, 837 F.3d 1042, 1046 (9th Cir. 2016). Factual findings "should be upheld unless the evidence compels a contrary result." *Id.* (internal quotation marks omitted). Where, as here, the "Board issues its own decision but relies in part on the [IJ's] reasoning, we review both decisions." *Id.* (internal quotation marks and adjustment omitted).

## III.

## A.

"[A]lien minors in [removal] proceedings are 'entitled to the [F]ifth [A]mendment guaranty of due process.'" *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1160 (9th Cir. 2004) (quoting *Larita-Martinez v. INS*, 220 F.3d 1092, 1095 (9th Cir. 2000)) (internal quotation marks omitted). That is because "'the private liberty interests involved in [removal] proceedings are indisputably substantial.'" *Id.* (internal adjustment omitted) (quoting *Dillingham v. INS*, 267 F.3d 996, 1010 (9th Cir. 2001)). The due process protections afforded aliens present in the United States—including alien minors—are the same regardless of whether the alien is here lawfully or unlawfully.[6] *Mathews v. Diaz*, 426 U.S. 67, 77 (1976).

---

[6] To be sure, aliens—regardless of status—enjoy a lesser quantum of constitutional protection than do citizens. *Diaz*, 426 U.S. at 78. And not all aliens receive the same degree of protection. Under the "entry fiction," an alien who—unlike C.J.—has not effected entry into the United States, but rather seeks admission at a port of entry, lacks constitutional rights. *See Servin-Espinoza v. Ashcroft*, 309 F.3d 1193, 1198 (9th Cir. 2002) ("Our immigration law has generally treated aliens who are already on our soil (and who are therefore deportable) more favorably than aliens who are merely seeking admittance (and who are therefore excludable)."); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1107 (9th Cir. 2001) (under the "entry fiction," aliens "standing on the threshold of entry" are "not entitled to the constitutional protections provided to those within the territorial jurisdiction of the United States"); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders.").

Alien minors' due process rights include (i) the right to counsel "at no expense to the Government," *Montes-Lopez*, 694 F.3d at 1088–89; 8 U.S.C. § 1362; 8 C.F.R. § 1240.10(a)(1); (ii) the right to competent representation by such counsel, *Baltazar-Alcazar*, 386 F.3d at 944; *Jie Lin*, 377 F.3d at 1027; (iii) the right to a hearing before an IJ on the merits of an application for relief from deportation, 8 U.S.C. § 1226(a); (iv) the right to a translator, 8 C.F.R. § 1240.44; (v) the right that an adult who takes custody of an alien minor be served notice of a removal hearing, *Flores-Chavez*, 362 F.3d at 1157; *see also* 8 C.F.R. §§ 236.2(a), 1236.3; and, more generally, (vi) the right to a "full and fair hearing," which includes the "opportunity to present evidence and testimony on one's behalf," cross-examine witnesses, and examine and object to adverse evidence, *Oshodi v. Holder*, 729 F.3d 883, 889 (9th Cir. 2013) (en banc); *Jacinto v. INS*, 208 F.3d 725, 727 (9th Cir. 2000); *see also* 8 U.S.C. § 1229a(b); 8 C.F.R. § 1240.10(a). All of these rights are reflected in the INA and the INA's implementing regulations.

Violation of an alien minor's due process rights does not automatically require reversal. In most cases, the petitioner must also show prejudice. *See Jacinto*, 208 F.3d at 728. "Prejudice occurs when the rights of the alien have been transgressed in such a way as is likely to impact the results of the proceedings." *Id.* We have recognized one exception to this general rule. A petitioner need not show prejudice where he was denied his statutory right to privately-retained counsel. *Montes-Lopez*, 694 F.3d at 1092. In *Montes-Lopez*, we reasoned that the wholesale denial of counsel differs from other due process violations due to the combination of two factors. First, such a claim is anchored in an express statutory guarantee to a right to counsel. *Id.* Second, denial of counsel differs from other statutory violations because it

"fundamentally affects the whole of a proceeding," meaning it is "impractical for courts to determine whether prejudice accompanied a particular denial of counsel." *Id.*

C.J. seeks a determination that he is entitled to court-appointed counsel at government expense—a privilege that Congress has not conferred. Thus, consistent with the prevailing rule that a litigant must show prejudice to vindicate a due process violation, C.J. must show *both* that his constitutional rights were violated for lack of court-appointed counsel *and* that this prejudiced the outcome of his removal proceeding.

With the table set, we turn to assessing whether C.J.'s lack of court-appointed counsel violated his right to due process and, if so, whether he suffered prejudice.

**B.**

C.J. argues that Supreme Court and Ninth Circuit precedent compel the determination that alien minors are categorically entitled to court-appointed counsel at government expense. He relies largely on our decision in *Jie Lin*, where we held that the IJ "had the obligation to suspend the [removal] hearing and give [the minor] a new opportunity to retain competent counsel or *sua sponte* take steps to procure competent counsel to represent [him]." 377 F.3d at 1033.

C.J.'s reliance on *Jie Lin* is misplaced. Far from deciding that alien minors are categorically entitled to court-appointed counsel, *Jie Lin* held only that an IJ should assist minors in retaining the *private* counsel to which they are statutorily entitled. *See id.* at 1027, 1033–34.

*Jie Lin* involved retained counsel's inadequate representation of a minor. *Id.* at 1020. Counsel there failed to investigate petitioner Lin's case, largely did not prepare for his removal hearing, and may not have even spoken with Lin about his case. *Id.* at 1024–25. Unsurprisingly, counsel's advocacy was anything but zealous. For example, she neglected to present (or discover) information critical to Lin's asylum claim—namely, that he fled China "on account of" persecution or fear of persecution. *Id.* at 1026. In fact, counsel's performance was so wanting that we found that Lin likely would have been better off unrepresented. *Id.* at 1027.

In assessing the sufficiency of Lin's hearing, we began with the text of the INA, which provides a "statutory right [in removal proceedings] . . . to be 'represented (*at no expense to the Government*) . . . .'" *Id.* (quoting 8 U.S.C. § 1362) (emphasis added). We explained that "due process mandates that [an alien] is entitled to counsel of his own choice *at his own expense* under terms of the [INA]." *Id.* (internal quotation marks omitted; emphasis added). Once counsel is retained, a petitioner has a legal right "to have that counsel perform with sufficient competence." *Id.*

We then proceeded to criticize the IJ for not taking steps to secure competent counsel for Lin:

> Given that minors are "entitled to trained legal assistance so their rights may be fully protected," *Johns v. Cnty. of San Diego*, 114 F.3d 874, 877 (9th Cir. 1997) (citation omitted), upon recognizing that New York counsel was in no position to provide effective assistance, as he must have, the IJ had the obligation to suspend the hearing and

> give Lin a new opportunity to retain
> competent counsel or *sua sponte* take steps to
> procure competent counsel to represent Lin.

*Id.* at 1033. We concluded that "[a]bsent a minor's knowing, intelligent, and voluntary waiver of the right to counsel, the IJ may have to take an affirmative role in securing representation by competent counsel." *Id.* at 1034.

*Jie Lin* stands for the unremarkable proposition that minors are entitled to heightened protections in removal proceedings. Both the Supreme Court and our own circuit have recognized the psychological and mental limitations inherent in being a minor. *See In re Gault*, 387 U.S. 1, 36–37, 41 (1967); *Jie Lin*, 377 F.3d at 1025; *Johns*, 114 F.3d at 877. Children are, as a general rule, less capable of advocating for themselves than are adults. This fact is as true in the immigration context as any other. Thus, in *Jie Lin* we appropriately considered the juvenile status of the petitioner in admonishing the IJ for failing to do more to secure him competent representation. *See* 377 F.3d at 1033.

*Jie Lin* does not extend to the right C.J. demands here. First, *Jie Lin* is rooted firmly in the statutory right to privately-retained counsel. *See id.* at 1027. C.J. ignores this fact, insisting that we should instead focus on *Jie Lin*'s language touting the value of attorney representation for minors. To reiterate: *Jie Lin* did not hold that minors are categorically entitled to court-appointed counsel at government expense. Indeed, in offering the IJ a basket of options to consider on remand, conspicuously absent from *Jie Lin* is any suggestion that the government should foot the bill for counsel. We observed that the IJ could have postponed the hearing to allow "[Lin] and his relatives another

opportunity to obtain competent counsel," or that the IJ himself could have "*sua sponte* take[n] steps to procure competent counsel." *Id.* at 1033. Those options fall squarely within the four corners of the statute.

Second, *Jie Lin* involved retained counsel's woefully deficient performance. Counsel's advocacy was so poor that it "flirted with denial of counsel altogether." *Id.* By allowing the proceeding to go forward, the IJ effectively denied Lin his statutory right to legal representation, which amounted to an involuntary waiver of counsel—a clear due process violation. *Id.* Lin was, in effect, a victim of his own labor: his relatives had made "good faith efforts" to retain counsel, yet the attorney he ultimately secured actually did him a disservice. *See id.* at 1032.

C.J.'s case resembles Lin's in that both matters involve alien minors in removal proceedings who effectively went legally unrepresented. But the similarities end there. Lin retained counsel, whereas C.J. did not. And Lin was entitled to a remedy in line with his statutory right to privately-retained counsel, whereas C.J. seeks something beyond Congress' prescription.

To the extent C.J. suggests that the IJ failed to provide even the level of assistance required by *Jie Lin*, that argument is meritless. DHS provided C.J.'s mother with a list of *pro bono* attorneys, and the IJ granted several continuances—over the course of nearly a year and a half—to allow C.J.'s mother to secure legal counsel. The IJ thus "t[ook] an affirmative role in securing representation by competent counsel" for C.J., which is all that *Jie Lin* requires. *Id.* at 1034.

C.J.'s other cited authorities are even more attenuated. C.J. relies on the Supreme Court's decision in *Gault*, which held—outside the immigration context—that minors in delinquency proceedings are entitled to court-appointed counsel at government expense where a consequence of the proceeding is that the minor "may be committed to a state institution." 387 U.S. at 13. Due to the "awesome prospect of incarceration" that could result from an adverse ruling, "the child and his parents must be notified of the child's right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child." *Id*. at 36–37, 41.

C.J. argues that *Gault* reflects a "general rule . . . that children cannot receive fair hearings absent counsel." He notes that state legislatures and courts have recognized an explicit right to counsel for minors in delinquency proceedings, which follows from Supreme Court decisions "adopting special protective rules for children because of their limited capacity."

C.J.'s attempt to bootstrap *Gault* into the immigration context is unpersuasive. None of his cited authorities goes so far as to create a right to government-funded, court-appointed counsel for aliens illegally present in the United States.[7]

---

[7] The one extra-circuit case holding that aliens may, in specific circumstances, be entitled to court-appointed counsel was decided in the context of lawful permanent residents ("LPRs") who are—unlike C.J.—lawfully present. *See Aguilera-Enriquez v. INS*, 516 F.2d 565, 568 n.3 (6th Cir. 1975) & *id.* at 574 n.6 (DeMascio, J., dissenting). And, at any rate, the Sixth Circuit's decision is collecting dust: In the more than forty years since *Aguilera-Enriquez* was decided, we are aware of no case from any circuit endorsing the Sixth Circuit's broad interpretation of the Due Process Clause for aliens in immigration proceedings.

*Gault*, by its terms, is limited "only [to] the problems" relating to "proceedings by which a determination is made as to whether a juvenile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution." 387 U.S. at 13. The Court was preoccupied with the fact that non-represented juveniles face the possibility of being incarcerated in a state institution—which is akin to punishment for a criminal conviction. *Id.* at 36–37, 41, 42. This fact was essential to the Court's holding. *See id.* at 42 ("[I]n view of the seriousness of the charge and *the potential commitment . . . .*" (emphasis added)); *see also Turner v. Rogers*, 564 U.S. 431, 442–43 (2011) (the "pre-eminent generalization that emerges from this Court's precedents on an indigent's right to appointed counsel is that such a right has been recognized to exist *only where the litigant may lose his physical liberty* if he loses the litigation" (emphasis added) (quoting *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 25 (1981)). Nothing in *Gault* or its progeny compels the outcome that minors in civil immigration proceedings who do not face the threat of incarceration are categorically entitled to court-appointed counsel. Indeed, "the [Supreme] Court has [never] determined that due process principles of fundamental fairness categorically require counsel in any context outside criminal proceedings." *Turner*, 564 U.S. at 454 (Thomas, J., dissenting). We therefore hold that it is not established law that alien minors are categorically entitled to government-funded, court-appointed counsel.

## C.

C.J. may nonetheless be able to show that, even absent controlling case law, the Due Process Clause implies a right to court-appointed counsel at government expense. To

determine whether a procedural due process violation occurred, C.J. must clear two hurdles. First, he must satisfy the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (applying the *Mathews* framework to removal proceedings). Under *Mathews*, we "determine what process is due by balancing (1) the private interest at stake, (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional safeguards,' and (3) the government's interest, including the burdens of any additional process." *Oshodi*, 729 F.3d at 894 (internal adjustment omitted; quoting *Mathews*, 424 U.S. at 335).

If C.J. makes it past the *Mathews* three-part test, then we proceed to consider whether the rebuttable presumption against court-appointed counsel applies. The Supreme Court has explained that the presumption applies unless "the indigent, if he is unsuccessful, may lose his personal freedom." *Lassiter*, 452 U.S. at 27 (emphasis added). If the presumption *does* apply, then we weigh the outcome of the *Mathews* test against that presumption. *See id.* Thus, a litigant could clear *Mathews* but still fail to demonstrate a due process right to government-funded, court-appointed counsel.

We may assume for purposes of this opinion that C.J. qualifies as indigent. Whether he faces a loss of his "personal freedom" is a closer question. Arguably, sending C.J. back to a hostile environment where he has faced death threats in the past implicates his freedom. On the other hand, *Lassiter* explains that "*actual imprisonment* [is] the line defining the constitutional right to appointment of counsel." *Id.* at 26 (internal quotation marks omitted; emphasis added). However, we need not and do not reach the question whether

the presumption against court-appointed counsel applies here because we conclude that C.J.'s claim does not even survive the *Mathews* inquiry.

Finally, we proceed cautiously, remaining at all times mindful of the peculiar and restricted role of the judiciary in reviewing matters of immigration policy. Because Congress exercises plenary control over our Nation's immigration system, its determinations are owed an exceedingly high level of deference. *See Mezei*, 345 U.S. at 210. Indeed, deference to Congress is particularly strong in the area of immigration because "over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo*, 430 U.S. at 792 (internal quotation marks omitted). It therefore "must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Plasencia*, 459 U.S. at 34. As a result, we are chary of discerning a constitutional infirmity in Congress' considered judgment—as reflected in the INA—unless the matter before us is susceptible of no other determination.

## 1.

Turning to the first *Mathews* factor, we must assess the private interest at stake. The government argues that C.J.'s interest is low for several reasons. First, he was apprehended within four days of crossing the border, and so, the government contends, he has only a minimal interest in remaining in the country. Second, because C.J. has no legal status, he does not stand to lose an immigration benefit, and so, the government reasons, he has less of an interest in staying than a legally admitted alien. And third, the government argues that the basis for C.J.'s purported

interest—his fear of returning to Honduras—is not a private interest in itself. What he really seeks is asylum, which is a form of discretionary relief separate and apart from any personal liberty interest.

The government's position has substantial common sense appeal. An alien's private interest in remaining on U.S. soil is logically tied to the duration of his residency here. But our lodestar is controlling precedent, and the Supreme Court and prior panels of this court have focused the relevant inquiry in formal removal proceedings on the consequence of an adverse ruling: deportation. We have made clear that "[i]n the case of an asylum and withholding of removal applicant, the private interest could hardly be greater. If the court errs, the consequences for the applicant could be severe persecution, torture, or even death."[8]  *Oshodi*, 729 F.3d at 894. The Supreme Court has concurred in this assessment, explaining that "[d]eportation is always a harsh measure; it is all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987). An alien facing deportation "stands to lose the right 'to stay and live and work in this land of freedom.'" *Plasencia*, 459 U.S. at 34 (quoting *Bridges v. Wixon*, 326 U.S. 135, 154 (1945)).

---

[8] An alien's legal status deserves limited weight in the private interest calculus for the additional reason that Congress has provided a pathway to legal status for those illegally present via a defensive claim for asylum, withholding of removal, and CAT relief. *See, e.g.*, 8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States . . . *irrespective of such alien's status*, may apply for asylum . . . ." (emphasis added)).

If C.J. is deported, he will be returned to a country where his liberty—indeed, he alleges his very life—may be at risk. The fact that the Maras attempted to recruit him under duress—at gunpoint no less—before he fled provides reason to believe that C.J. would encounter similar threats and perhaps worse upon his return. Thus, under our precedent, the first *Mathews* factor favors C.J.

**2.**

The second *Mathews* factor requires measuring the adequacy of existing procedures and weighing the risk of erroneous deprivation of C.J.'s rights if additional safeguards are not provided. *Oshodi*, 729 F.3d at 894. C.J.'s arguments here fall into two camps: first, that children are ill-equipped to navigate the United States' byzantine immigration system; and, second, that the IJ failed to provide him with a full and fair hearing.

C.J. insists that he cannot be assured a full and fair hearing without legal representation. He notes that asylum law is "extremely complex," and has proved vexing even to the courts of appeals, spawning "inter-circuit disagreement" over, for example, how to make social group determinations. A minor could not reasonably know that he must demonstrate that the Maras targeted him based on some protected social group status. C.J. also cites government data from 2014 showing that only 10% of unrepresented children were permitted to remain in the United States, whereas 47% of represented children were awarded relief in their immigration proceedings. Finally, C.J. argues that the asymmetry of representation between the government—which is always represented by counsel—and an unrepresented minor renders the proceedings inherently unfair.

We accept certain of C.J.'s assertions for purposes of our analysis. We assume that an attorney provides a level of advocacy that cannot be supplied by any of the other classes of persons that an alien is entitled to have accompany him in a removal proceeding. *See* 8 C.F.R. § 1240.10(c). We also assume the accuracy of his figures, which show that alien minors represented by counsel are awarded relief at higher rates than those who go without. But our lodestar is the due process right to a full and fair hearing—not some conceived-of entitlement to the skills of an attorney. *See Plasencia*, 459 U.S. at 34–35. Indeed, "[t]he role of the judiciary [in immigration proceedings] is limited to determining whether the procedures meet *the essential standard of fairness under the Due Process Clause* and does not extend to imposing procedures that merely displace congressional choices of policy." *Id.* (emphasis added). Whether alien minors can be afforded a full and fair hearing absent court-appointed counsel, and whether C.J. was afforded a full and fair hearing in his particular case, therefore guides our inquiry.

Section 1229a(b)(4)(B) of the INA sets forth the statutory full-and-fair-hearing requirement for immigration proceedings. 8 U.S.C. § 1229a(b)(4)(B). It provides that "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government . . . ." *Id.* An IJ also has an independent obligation to "fully and fairly develop the record." *Jacinto*, 208 F.3d at 733 (internal quotation marks omitted). This includes an "affirmative duty, imposed by statute, to develop a clear record for appeal." *Oshodi*, 729 F.3d at 900; *see also* 8 U.S.C. § 1229a(b)(1). This duty distinguishes immigration proceedings from other adversarial forums where judges act only as neutral arbiters. Instead, the IJ shares the

responsibility with the applicant to "'ascertain and evaluate all relevant facts.'" *Jacinto*, 208 F.3d at 732–33 (quoting the United Nations *Handbook on Procedures & Criteria for Determining Refugee Status*: Office of the United Nations High Commissioner for Refugees (1979)).

In the relief-from-removal context, the IJ's duty requires developing a factual record sufficient to determine if an applicant satisfies the legal criteria for asylum. The IJ's obligation is heightened where, as here, the alien appears pro se.

> Because aliens appearing pro se often lack the legal knowledge to navigate their way successfully through the morass of immigration law, and because their failure to do so successfully might result in their expulsion from this country, it is critical that the IJ scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.

*Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) (internal quotation marks omitted). The IJ must also take special consideration of a *minor* who proceeds pro se. *See Hernandez-Ortiz v. Gonzales*, 496 F.3d 1042, 1045–46 (9th Cir. 2007).

In C.J.'s case, the onus was almost entirely on the IJ to develop the record. C.J.'s mother was ill-equipped to understand the proceedings or to comprehend C.J.'s burden in establishing eligibility for relief, and the government asked

no questions.  Thus, it was up to the IJ to discover any facts that might support C.J.'s asylum claim.**⁹**

To determine whether the IJ provided a full and fair hearing, our analysis proceeds in several steps.  First, we disaggregate the asylum standard into its constituent parts and assess whether the IJ developed the record as to each. Second, if the IJ adequately developed the record as to a

---

**⁹** C.J. only argues that the risk of erroneous deprivation is high with regard to his claim for asylum, noting that his "asylum claim is [] extremely complex."  He does not contend that the risk of erroneous deprivation is high absent court-appointed counsel—or any other additional process—with regard to his withholding and CAT claims.  For example, C.J. focuses only on the criteria necessary for a successful asylum claim—e.g., discussing whether he was persecuted "on account of" a protected basis in the context of asylum, and assessing whether his asylum form provided a sufficient record to measure his eligibility for relief.  We therefore consider C.J.'s due process argument only as concerns his asylum claim, and deem waived any argument that he was denied due process on his withholding and CAT claims.  *See Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1149 (9th Cir. 2016). But even were we to expand our due process analysis to his withholding claim, that would not change the outcome.  While withholding of removal and asylum share the same substantive requirements, withholding "requires a higher probability of persecution."  *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (internal quotation marks omitted). Because we conclude that the IJ adequately developed the record with regard to C.J.'s asylum claim, and because substantial evidence supports the IJ's determination that C.J. is not entitled to asylum relief, his withholding claim necessarily fails.  *See id.*

That still leaves C.J.'s CAT claim.  Because the standard for CAT relief differs from asylum and withholding, we separately address C.J.'s argument that the record compels a finding that C.J. is entitled to CAT relief in Part VI, *infra*.

particular asylum factor, we consider whether the IJ's determination as to that factor is supported by substantial evidence. We incorporate this inquiry into the *Mathews* analysis because it is critical to determining whether C.J. was prejudiced by any procedural deficiencies. Finally, because the second *Mathews* factor requires looking both "to the process given [C.J.] in this case, as well as the process generally given" to alien minors in removal proceedings, *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1082 (9th Cir. 2010), we consider whether additional process is required either in C.J.'s case or for alien minors as a class.

**i.**

An applicant qualifies for asylum—i.e., refugee status—if he

> is unable or unwilling to return to his home country because of a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. An applicant may establish a well-founded fear of future persecution in two ways: by proving past persecution, or by demonstrating that he has a subjectively genuine and objectively reasonable fear of future persecution.

*Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062 (9th Cir. 2017) (en banc) (internal quotation marks and citations omitted).

***Well-Founded Fear of Future Persecution.*** An applicant for asylum must show a well-founded fear of future persecution. *See Lim v. INS*, 224 F.3d 929, 936 (9th Cir. 2000). "A finding of past persecution raises a regulatory presumption of future persecution and flips the burden of proof to the [government] to show that conditions have changed to such a degree that the inference is invalid." *Id.*

Substantial evidence supports the Board's conclusion that C.J. was not persecuted. We have long recognized that "[t]hreats, standing alone . . . [do not] constitute past persecution" unless "the threats are so menacing as to cause significant actual suffering or harm." *Id.* (internal quotation marks omitted). Here, C.J. was never physically harmed, and the Maras' recruitment efforts—while appalling—did not plainly cross the line from harassment to persecution. *See Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003) (deeming unfulfilled threats to be harassment rather than persecution); *cf. Mashiri v. Ashcroft*, 383 F.3d 1112, 1115–17, 1119–20 (9th Cir. 2004) (finding past persecution where petitioners not only received a death threat, but where, *inter alia*, one of the petitioners was injured trying to escape a xenophobic mob, another was "violently attacked" multiple times, and an ethnic store was firebombed).[10]

---

[10] To be sure, this is a close question. C.J. was promised that he and his family would be killed if he did not join the gang. The Board would have acted within its discretion had it found past persecution on these facts. *See Ruano v. Ashcroft*, 301 F.3d 1155, 1160–61 (9th Cir. 2002) (finding past persecution where applicant was threatened with death and confronted by men with guns). But because we have held in other cases that multiple years of physical abuse does not compel a finding of past persecution, we decline to hold otherwise here where C.J. suffered no physical harm. *See, e.g.*, *Halim v. Holder*, 590 F.3d 971, 975–76 (9th Cir. 2009); *Kamla Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995).

"In the absence of past persecution, [C.J.] may still be eligible for asylum based on a well-founded fear of future persecution. A well-founded fear 'must be both subjectively genuine and objectively reasonable.'" *Halim v. Holder*, 590 F.3d 971, 976 (9th Cir. 2009) (quoting *Ahmed v. Keisler*, 504 F.3d 1183, 1191 (9th Cir. 2007)). In other words, C.J. must show that his fear is both subjectively reasonable and "objectively well-founded." *Lim*, 224 F.3d at 935 (internal quotation marks omitted). The IJ determined that C.J. was credible and that his fear of persecution was subjectively reasonable. We thus focus on whether he has satisfied the test's objective prong.

"'The objective requirement can be met either through the production of specific documentary evidence or by credible and persuasive testimony.'" *Halim*, 590 F.3d at 976 (quoting *Ladha v. INS*, 215 F.3d 889, 897 (9th Cir. 2000)). "To effect a well-founded fear, a threat need not be statistically more than fifty-percent likely; the Supreme Court has suggested that even a one-tenth possibility of persecution might effect a well-founded fear." *Lim*, 224 F.3d at 934.

While we have found that mere threats do not compel a finding of past persecution, threats alone may give rise to a well-founded fear of future persecution because they portend a likelihood of future physical harm. *See id.* at 936. "Our court generally treats unfulfilled threats, without more, as within that category of conduct indicative of a danger of future persecution, rather than as past persecution itself." *Id.* (collecting cases). Curiously, the government contests only C.J.'s claim of past persecution, and ignores his argument that his past experiences support a reasonable fear of future persecution.

We conclude that C.J. has shown at least a "one-tenth possibility of persecution." *Lim* is instructive. That case involved a Filipino intelligence officer, Lim, who received death threats over the course of several years. *Id.* at 932–33. He was never physically confronted, let alone attacked. *Id.* at 933. The Board rejected Lim's asylum application because, *inter alia*, he suffered no physical harm during the six-year period of death threats, and his family in the Philippines went untouched. *Id.*

We granted Lim's petition. We explained that "[a]lthough [Lim] was never confronted nor physically harmed, he was threatened with death, he was followed, he appeared on a death list, and his colleagues who received similar threats were killed." *Id.* at 935. We held that a reasonable factfinder would be compelled to find that Lim's fears were therefore "objectively well-founded." *Id.* (internal quotation marks omitted); *cf. Halim*, 590 F.3d at 977 (petitioner failed to establish a well-founded fear of persecution where the government—his alleged persecutors—actually saved him when he was attacked, and where he alleged no persecution in the four years preceding his emigration to the United States).

C.J.'s fear of persecution is even more "well-founded" than Lim's. Unlike Lim, who received death threats from afar, C.J. was actually confronted by the Maras in person on several occasions. The threats also became "more menacing" over time, culminating in a harrowing encounter in which a gang member put a gun to his head, and gave him a date certain—the next day—to die if he did not join the gang. Moreover, Lim was an adult whereas C.J. is a minor. "Age can be a critical factor in the adjudication of asylum claims and may bear heavily on the question of whether an applicant

was persecuted or whether she holds a well-founded fear of future persecution." *Hernandez-Ortiz*, 496 F.3d at 1045 (internal quotation marks and adjustment omitted). That is because the "harm a child fears or has suffered may be relatively less than that of an adult and still qualify as persecution." *Id.* (internal quotation marks and adjustment omitted). Put another way, in the case of a minor, the persecution prong is relaxed. If an adult in *Lim* had a well-founded fear of persecution where he was not even confronted by his persecutors, it stands to reason that C.J., a 13-year-old boy at the time, has demonstrated a well-founded fear where he endured in-person threats to his life. C.J. has therefore demonstrated at least a "one-tenth possibility of persecution" if he returns to Honduras. The record compels a finding that the Board erred in concluding otherwise.

***Protected Status***. C.J. must still show that his fear of future persecution is "on account of" a protected basis—namely race, religion, nationality, *membership in a particular social group*, or political opinion. *Jacinto*, 208 F.3d at 734 (citing 8 U.S.C. § 1101(a)(42)(A)). Thus, the Maras' threats must have a nexus to one of these categories. C.J. argues that because the Maras threatened not only himself, but also his mother, aunt, and uncles, his claim qualifies under the social group category of family.

C.J. is correct that familial affiliation can be a recognized social group, but simple association is not enough. *See Jie Lin*, 377 F.3d at 1029. Family status is a legitimate basis for relief where the applicant is persecuted *because of* his relationship to his family members. In *Jie Lin*, Lin's parents were targeted by the Chinese government for violating its family planning policy. *Id.* at 1019. The court recognized Lin's family as a cognizable social group because the Chinese

government threatened Lin "on account of" his close ties to his parents. *Id.* at 1028.[11] Critically, the basis for Lin's claim for relief was that his *parents' actions* had put him in danger. *See id.* at 1021. C.J.'s case presents the inverse situation: C.J. was not threatened "on account of" his relationship to his mother, aunt, or uncles. Instead, the record reflects that C.J.'s family was threatened because of *C.J.'s* refusal to join the Maras.

The IJ asked C.J. a logical and sequential series of questions to draw this conclusion. The IJ began by asking C.J. who "was causing problems for you?" C.J. responded that it was "the Maras." The IJ then asked C.J.: "[W]hat kind of problems did you have with the gang?" CJ responded: "Well they wanted me to join the Maras and I said that I wouldn't. So they said they were going to beat me up, so my mother said that we should come [to the United States]." The IJ then asked C.J. whether the Maras "threaten[ed] to harm any of your other family members in Honduras." C.J. responded that they had. The IJ followed up, asking C.J. who the Maras had threatened, to which C.J. answered: "They said they would kill my uncles, aunt and uncles, and my mother and I, but we came here, so we don't know." Finally, the IJ probed whether there was any other basis for protected class status, asking C.J.'s mother again if the reason he came to the United States was because he was "being threatened by the gangs." C.J.'s mother answered: "Yes."

---

[11] *See Rodriguez v. INS*, 841 F.2d 865, 871 (9th Cir. 1987) (family constituted a cognizable social group where petitioner's family members were attacked for their political beliefs); *see also Del Valle v. INS*, 776 F.2d 1407, 1413 (9th Cir. 1985) ("evidence [] suggest[ing] that [petitioner's] family has been particularly affected by the conditions in their country [] helps support [petitioner's] claim for asylum" (internal citations omitted)).

The IJ's inquiry was adequate. The IJ asked questions that elicited answers establishing that C.J. was threatened because the Maras tried to recruit him. *Cf. Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1092–93 (9th Cir. 2013) (en banc) (finding that those who testify against gangs comprise a cognizable social group, but declining to extend this determination to individuals who simply resist gang recruitment efforts). The Maras' threats against him were not derivative of any persecution against members of his family. C.J. complains that the IJ should have asked him and Maria additional questions to determine why the gang also threatened his mother, aunt, and uncles, but the IJ explored this issue to the extent necessary to reasonably conclude that such questions were unnecessary. Even if the Maras targeted C.J.'s family for reasons independent of their efforts to recruit C.J., that would not change the fact that C.J. was not threatened "on account of" his family. He was, by his own testimony, threatened because he courageously refused the Maras' repeated demands to join them. The IJ therefore did not fail to fully develop the record on the question of protected status.

Having determined that no due process violation occurred regarding whether C.J. has established a protected ground—a necessary condition for granting asylum relief—the only question is whether substantial evidence supports the Board's determination under our highly deferential standard of review. For the reasons stated above, we hold that it does.

***Inability or Unwillingness of the Government to Control the Maras*.** C.J. must also show that the persecution he fears is by the "government or forces the government is either unable or unwilling to control." *Nahrvani v. Gonzales*, 399 F.3d 1148, 1154 (9th Cir. 2005) (internal quotation marks

omitted). C.J. testified that he did not report the Maras' threats to the police because "they couldn't do anything," adding that he was "very afraid." The IJ concluded that because C.J. failed to provide evidence that the police would not have helped him had he reported the Maras, he failed to establish that the Honduran government was unable or unwilling to control them.

C.J. has waived any challenge to the IJ's finding on this point—which is an independent basis for rejecting his asylum and withholding claims—by not challenging it on appeal to the Board. *See Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004) (court lacks subject matter jurisdiction to consider claims not presented to the Board). But even were we to consider this issue, we would find that the IJ adequately developed the record and that her determination was based on substantial evidence.

The IJ adequately developed the record by introducing and considering a 2014 State Department country conditions report on Honduras. State Department reports may provide objective evidence of a government's inability or unwillingness to control private actors. *See, e.g.*, *Gomes v. Gonzales*, 429 F.3d 1264, 1267 (9th Cir. 2005). Far from reflecting the Honduran government's inability or unwillingness to control gang violence, the 2014 report states that security forces severely punish gang members. Accordingly, because the report does not support C.J.'s subjective statement that the police "couldn't do anything," we cannot disturb the Board's finding that C.J. has not shown that the government is unable or unwilling to control the Maras. *See Budiono*, 837 F.3d at 1046.

## ii.

To be sure, C.J.'s removal proceeding was not a paragon of procedural decorum. The IJ should have more clearly explained the standard for asylum relief, and may have confused Maria by telling her that she could "*either* request a little more time to find an attorney . . . *or* you can go forward today and . . . speak on behalf of your son." In fact, Maria was legally entitled to *both* retain legal representation *and* speak on behalf of C.J. *See Jacinto*, 208 F.3d at 729. In *Jacinto*, we concluded that such defects violated the petitioner's right to a full and fair hearing. *Id.* at 729, 734; *see also Agyeman*, 296 F.3d at 883 ("We have previously emphasized the importance of explaining to an alien what evidence will demonstrate their eligibility for relief from deportation.").[12]

Even so, C.J. fails to show that the additional process he seeks—government-funded, court-appointed counsel—is necessary, either in his case or for alien minors as a class. *See Buckingham*, 603 F.3d at 1082 (courts must consider the adequacy of the process provided in the context of similarly situated litigants). As the government correctly observes, a

---

[12] The IJ did, however, provide most of the procedural safeguards necessary to ensure a full and fair hearing. The IJ asked C.J. questions to determine potential avenues for relief, including adjustment of status, withholding of removal, asylum, and derivative citizenship. The IJ also provided an interpreter, explained the NTA in plain language, discussed the *pro bono* list of attorneys provided to Maria, advised C.J. of his right to counsel, gave Maria an asylum application to fill out, provided the parties with a country conditions report, gave Maria an opportunity to give a narrative statement in support of C.J., explained C.J.'s appeal rights, and—to reiterate—granted four continuances spanning nearly a year and a half, which afforded Maria multiple opportunities to secure counsel.

less costly yet effective process already exists to safeguard the rights of minors in formal removal proceedings: remand to an IJ to correct any deficiencies. If an IJ fails to provide a full and fair hearing, as is required by the INA, and this results in prejudice, then the proportionate remedy is to grant the petition for review with instructions to the IJ to more fully develop the record. *See, e.g.*, *Jacinto*, 208 F.3d at 735. Indeed, the fact that Congress vested IJs with the responsibility of investigating and developing an applicant's claims tilts the equities in favor of the government on the second *Mathews* factor. A litigant in C.J.'s position must show that, not only was he deprived of a full and fair hearing, but that *had the IJ performed her duty to provide one*, the Constitution would *still* entitle him to court-appointed counsel.[13]     C.J. falls well short of accomplishing this Herculean task because he fails to show that the process Congress prescribed is categorically inadequate to vindicate an alien minor's right to due process. The second *Mathews* factor favors the government.

**3.**

"The final *Mathews* factor requires [the court] to consider the burdens [its] holding may place on the administrative process." *Oshodi*, 729 F.3d at 896. The court must assess the "interest of the government in using the current procedures rather than additional or different procedures," and account for the costs of imposing additional procedures. *Plasencia*, 459 U.S. at 34.

---

[13] Implicit in the IJ's responsibility to independently develop the record is the obligation to account for a petitioner's pro se status and age in conducting a removal proceeding. *See Agyeman*, 296 F.3d at 877; *Hernandez-Ortiz*, 496 F.3d at 1045–46.

C.J. argues that because the government already pays a lawyer to represent its interests in immigration proceedings involving minors, providing counsel for minors is necessary to remedy an "asymmetry of representation." *Cf. Turner*, 564 U.S. at 447. C.J. also posits that the financial burden on the government is manageable because only 6,500 unrepresented children are in removal proceedings in the Ninth Circuit, resulting in a total cost of approximately $17.5 million when calculated at government contractors' estimate of $2,700 per case.

The government begs to differ. Noting that DHS apprehended 102,264 juveniles at or near the border in FY 2016 alone, the cost of appointing counsel for all of them at $2,700 per case (a conservative figure, according to the government) would be a staggering $276.1 million per year. This would consume roughly 68% of the Executive Office for Immigration Review's ("EOIR") total budget. The government also warns of potential unintended consequences from such a mandate: juveniles that could afford attorneys would opt for government-funded counsel instead, and organizations offering *pro bono* legal services would shift scarce resources elsewhere.

The ultimate cost of government-funded, court-appointed counsel likely falls somewhere between C.J.'s and the government's estimates. C.J. surely underestimates the cost by limiting his sample size to the Ninth Circuit. Any decision from this court resulting in a new constitutional right for alien minors would ricochet across the country, teeing up copycat suits in other circuits and vastly expanding the pool of eligible applicants. On the other hand, the government's assumption that *all* eligible minors would take advantage of free court-appointed counsel is speculative. The government

also fails to disaggregate the data to account for those minors eligible for expedited removal—we have never held that aliens in expedited removal proceedings enjoy a statutory right to even privately-retained counsel.[14]

Even if the government's figures are inflated in one way, they are likely undervalued in another. Mandating free court-appointed counsel could further strain an already overextended immigration system. IJs would be tasked with locating and appointing counsel, which takes time. And government attorneys would need to expend additional resources communicating with opposing counsel, filing responses to motions, and preparing what would likely be a longer administrative record—all of which come at considerable expense. *Cf. Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 324 (1985) (recognizing lawyers' professional obligation to "contest with vigor all adverse evidence and views").

Ultimately, wherever the government's burden falls between the parties' estimates, the third *Mathews* factor favors the government. Requiring government-funded counsel would significantly increase the funds expended on immigration matters.

---

[14] *Cf. United States v. Peralta-Sanchez*, 705 F. App'x 542, 544 (9th Cir. 2017) (unpublished) (assuming without deciding that aliens in expedited removal proceedings have a due process right to privately-retained counsel); DHS, *Designating Aliens for Expedited Removal* (Notice), 69 Fed. Reg. 48877-01, 48878–79 (Aug. 11, 2004) (recognizing that "*unaccompanied* minors . . . may possess equities that weigh against the use of expedited removal proceedings" (emphasis added)).

**4.**

Having evaluated each *Mathews* factor individually as applied to C.J.'s case, we turn next to assessing the factors collectively.  We conclude that, notwithstanding that the first *Mathews* factor favors C.J., the second and third factors tip the balance strongly in favor of the government.  No matter the strength of C.J.'s interest in not being deported (the first factor), he has not shown a necessity for government-funded, court-appointed counsel to safeguard his due process right to a full and fair hearing (the second factor).  Accordingly, even were we to find that the IJ failed to provide a full and fair hearing, and that this prejudiced C.J. (*see* Part III.C.5, *infra*), the appropriate remedy would be to remand with instructions to the IJ to adequately develop the record, not the appointment of counsel at government expense.[15]

We hasten to note that our conclusion relies on the second and not the third *Mathews* factor.  C.J. has a due process right to a full and fair hearing—a right that Congress codified and charged IJs with enforcing.  If we had concluded that, in C.J.'s case, this right could *only* be vindicated by assigning him court-appointed counsel—i.e., if we had determined that the risk of erroneous deprivation of C.J.'s right to a full and fair hearing absent court-appointed counsel was a virtual certainty—then we might have been compelled to award such relief to C.J.  Under *Mathews*, our paramount responsibility is to ensure that "the quantum and quality of the process" provided "serve[s] the purpose of minimizing the risk of error," *Greenholtz v. Inmates of Neb. Penal & Corr.*

---

[15] Because we conclude that C.J. is not entitled to court-appointed counsel in his own proceeding, his claim that alien minors enjoy a categorical right to court-appointed counsel necessarily fails.

*Complex*, 442 U.S. 1, 13 (1979) (citing *Mathews*, 424 U.S. at 335), and so the third *Mathews* factor must take a back seat to the second.

Further, and irrespective of the above observation, had the second *Mathews* factor favored C.J., then the third would likely do so, as well. The third factor considers "the interest of the government in using the current procedures rather than additional or different procedures." *Plasencia*, 459 U.S. at 34. The government has a compelling interest in the fair and just administration of our Nation's immigration laws. *See Walters v. Reno*, 145 F.3d 1032, 1043–44 (9th Cir. 1998). If that interest could only be realized in a particular case through court-appointed counsel, then the third factor would impel its provision. *Cf. Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973) ("there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees").

Finally, fundamental concerns of separation-of-powers are at play. By requiring IJs to fulfill Congress' direction yet demanding no more, we balance the judiciary's three core obligations in our divided system of government and avoid aggrandizing our own power. First, we act consonant with rather than beyond the scope of Congress' prescribed policy in an area over which it exercises plenary control. *See Zadvydas v. Davis*, 533 U.S. 678, 695 (2001); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976). Second, we satisfy our independent duty to "say what the law is" by articulating the scope and contours of Congress' full-and-fair-hearing guarantee. *See Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1156 (10th Cir. 2016) (Gorsuch, J., concurring) (citing *Marbury v. Madison*, 5 U.S. 137 (1803)). And third, we

check any violations of individual liberty where an IJ fails to provide the amount of process guaranteed by Congress. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) (courts have an independent obligation to ensure that the Board affords aliens the due process set forth in enacted legislation and implementing regulations); *see also Fiallo*, 430 U.S. at 793 n.5 ("Our cases reflect acceptance of a limited judicial responsibility under the Constitution even with respect to the power of Congress to regulate the admission and exclusion of aliens[.]").   Requiring court-appointed counsel at government expense would jettison the first obligation without enhancing our ability to implement the other two.

**5.**

In keeping with our third judicial obligation above, we consider next whether the shortcomings in C.J.'s proceeding violated his right to due process, and thus whether we must remand with instructions to the IJ to conduct a full and fair hearing.  "The lack of a full and fair hearing . . . will not alone establish a due process violation.  The alien must establish that []he suffered prejudice." *Jacinto*, 208 F.3d at 734.  Prejudice requires that the petitioner show "that the outcome of the proceeding *may have been affected* by the alleged violation." *Oshodi*, 729 F.3d at 896 (emphasis in original) (quoting *Zolotukhin v. Gonzales*, 417 F.3d 1073, 1076 (9th Cir. 2005)).  Prejudice results if the IJ fails to develop the record sufficient to determine whether the applicant qualifies for relief from deportation. *See Jacinto*, 208 F.3d at 734.

We conclude that any deficiencies in C.J.'s proceeding did not prejudice him because on the dispositive questions of

protected status and whether the Honduran government is unable or unwilling to control the Maras, the IJ adequately developed the record.[16]  Notwithstanding the IJ's failure to explain the standard for asylum, among other shortcomings, there exists no reasonable probability that C.J. would have been awarded asylum relief had the IJ satisfied her obligations.[17]  This is because substantial evidence supports the Board's determinations (i) that C.J.'s alleged persecution was not "on account of" a protected ground, and (ii) that C.J. failed to show that the Honduran government could not or would not control the Maras.  *See Budiono*, 837 F.3d at 1046.

## IV.

C.J. has one arrow left in his quiver on his asserted right to court-appointed counsel.  C.J. argues that the INA's fair hearing provision, 8 U.S.C. § 1229a(b)(4)(B), implicitly requires court-appointed counsel at government expense for all alien minors because, according to him, that is the "*only* way that children can be provided full and fair hearings." Our holding that C.J. was not prejudiced by any procedural deficiencies in his removal proceeding defeats this argument forthwith.

---

[16] As already noted, C.J. waived any argument that the IJ did not fully develop the record on the unable-or-unwilling-to-control issue.

[17] *See Tamayo-Tamayo v. Holder*, 725 F.3d 950, 954 (9th Cir. 2013) (petitioner was not prejudiced by a lack of legal counsel because issuance of a reinstatement-of-removal order was proper and, "even with skilled legal counsel, no relief was available to Petitioner"); *see also Acewicz v. INS*, 984 F.2d 1056, 1062 (9th Cir. 1993) (prejudice from lack of counsel requires a showing that counsel could have "better marshalled specific facts or arguments in presenting petitioner's case for asylum or withholding of [removal]" (internal quotation marks omitted)).

C.J.'s claim also fails as a matter of statutory interpretation. As the government correctly points out, reading an implied right to court-appointed counsel into § 1229a(b)(4)(B) would create a tension with the sub-section immediately preceding it. Section 1229a(b)(4)(A) provides aliens with the right to counsel "*at no expense to the Government*." 8 U.S.C. § 1229a(b)(4)(A) (emphasis added). C.J.'s proposed reading would effectively read out of the statute the quoted phrase, thereby running afoul of the canon of statutory construction that a court should interpret a statute as a cohesive whole in a way that gives effect to all of its provisions. *Padash v. INS*, 358 F.3d 1161, 1170–71 (9th Cir. 2004) ("[W]e must make every effort not to interpret the provision at issue in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." (internal quotation marks and adjustments omitted)); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (noting the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"). It would also violate the corollary canon that specific statutory provisions prevail over more general ones. *In re Matter of Spanish Peaks Holdings II, LLC*, 872 F.3d 892, 898 (9th Cir. 2017). Under this principle, to the extent § 1229a(b)(4)(B)'s full-and-fair-hearing requirement implies a right to counsel, as C.J. argues, that implied right must fit within the specific grant conferred by § 1229a(b)(4)(A). C.J. seeks much more. We decline his invitation to rewrite the INA.

## V.

C.J. also asserts that his due process rights were violated because the IJ failed to inform him of his possible eligibility

for SIJ status. An IJ is required to "inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make [an] application during the hearing . . . ." 8 C.F.R. § 1240.11(a)(2); *United States v. Lopez-Velasquez*, 629 F.3d 894, 896 (9th Cir. 2010) (en banc). "Apparent eligibility" is demonstrated "where the record, fairly reviewed by an individual who is intimately familiar with the immigration laws—as IJs no doubt are—raises a reasonable possibility that the petitioner may be eligible for relief." *Lopez-Velasquez*, 629 F.3d at 896 (internal quotation marks omitted). The IJ's duty is triggered where the alien "'or some other person puts information before the judge that makes such eligibility apparent.'" *Id*. at 900 (quoting *Moran-Enriquez v. INS*, 884 F.2d 420, 422 (9th Cir. 1989)). Put another way, the record must demonstrate "a factual basis for relief." *Id*. "[F]ailure to advise an alien of 'apparent eligibility' to apply for relief is a due process violation." *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1263 (9th Cir. 2013).

SIJ status provides a pathway to legal permanent resident ("LPR") status for undocumented minors who cannot be reunified with one or both parents because of abuse, neglect, or abandonment. Children, like C.J., who have been abandoned by one parent may be eligible even if the other parent retains custody.

Gaining SIJ status is a multi-step process. The minor must first obtain a court order from a state juvenile court. That court must, *inter alia*, "declare[]" that the child is a "dependent upon a juvenile court located in the United States in accordance with state law governing such declarations of dependency, while the alien was in the United States and

under the jurisdiction of the court"; and find that the child is "eligible . . . for long-term foster care." 8 C.F.R. § 204.11(c)(3)–(4).

If the state court makes the requisite findings, then the child may apply for SIJ status with the IJ. 8 U.S.C. § 1101(a)(27)(J). To grant SIJ status, the IJ must find that the child's reunification with one or both parents is not viable due to abuse, neglect, abandonment, or a similar basis under state law; and that it is not in the child's best interest to be returned to his country of nationality. *Id*.

If the IJ awards the child SIJ status, then the child may apply for legal residency. But even if the juvenile receives an SIJ designation, the IJ may refuse to grant the application for legal residency and may still order the alien removed. *See* 8 U.S.C. § 1255(a).

C.J. contends that the information at his removal hearing "raised the reasonable possibility that he may be eligible for [SIJ status]." He suggests vaguely that the facts before the IJ indicate that a state court would deem him dependent on the juvenile court. Based on his and Maria's testimony, C.J. also asserts that the IJ knew that "there [had] been many years" since C.J. had been in touch with his father, and that his father had "left [Maria] a long time ago," thereby satisfying the requirement that he show that reunification with at least one parent is not viable. C.J. further argues that because he credibly testified to death threats by the Maras, a state court would likely determine that it is not in his best interest to be returned to Honduras. Finally, C.J. goes one step further, asserting that access to SIJ status is only meaningful if this court appoints him counsel to shepherd his case through the California courts.

C.J.'s arguments founder on the fact that, at the time of his removal proceeding, he did not have a state court order deeming him to be, *inter alia*, a "dependent upon [the] juvenile court."  8 C.F.R. § 204.11(c)(3).  The IJ therefore could not have granted him SIJ status, meaning that C.J. was not "apparent[ly] eligib[le]" for immigration relief.  *Id.* § 1240.11(a)(2). Accordingly, the IJ's duty to inform was not triggered.  *Cf. Moran-Enriquez*, 884 F.2d at 423 (IJ had a duty to inform petitioner of relief from deportation where the petitioner's marriage to a United States citizen made him eligible for such relief).  *Contra United States v. Cabrera-Ochoa*, No. 5:15-cr-00206-BLF-1, 2016 WL 4204551, at *8 (N.D. Cal. Aug. 8, 2016).

C.J. counters that the INA requires the IJ to "inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter," 8 C.F.R. § 1240.11(a)(2), one of which is SIJ status, *see* 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. §§ 1245.1(a), (e)(2)(vi)(B)(3). But an alien qualified for SIJ classification is one for whom a state court has *already* made certain findings necessary for an IJ to grant SIJ status.  8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11.[18]   Had C.J. secured the requisite state court determinations and revealed that development in the immigration proceeding, then the IJ would have been obliged to inform him of his "apparent eligibility" to seek SIJ status.

---

[18] The regulations provide that "[a]n alien is eligible for classification as a special immigrant under [§] 101(a)(27)(J)" if the alien meets certain criteria.  Several of those criteria require that a state court have already made certain determinations.  For example, the alien must, *inter alia*, "*ha[ve] been declared* dependent upon a juvenile court . . . in accordance with state law governing such declarations of dependency," and have been "*deemed eligible by the juvenile court* for long-term foster care."  8 C.F.R. § 204.11(c)(3)–(4) (emphasis added).

But C.J. had not even initiated the state court process, and the IJ is not required to parse the record for evidence of a petitioner's potential eligibility to pursue an independent *state court* action.  As we have previously stated, "IJs are not expected to be clairvoyant" when it comes to informing aliens of their options for relief.[19]  *Moran-Enriquez*, 884 F.2d at 422.

Finally, even were we to conclude (which we do not) that an IJ must, as a general rule, advise an alien minor of immigration relief that may be available based on hypothetical findings by a state court, C.J.'s eligibility for SIJ

---

[19] C.J.'s references to a non-binding statement by a DHS official and a brief discussion of the SIJ process contained in a DHS training manual are unavailing.  C.J. notes that DHS has commented that IJs have assisted unrepresented children in obtaining SIJ status.  Specifically, former Acting Chief IJ for Vulnerable Populations stated in a deposition in this case: "I'm confident if [SIJ status] comes to the attention of the judge, that we have ample tools and resources to get that through the state court process." For its part, the training manual describes a course on how the "SIJ program relates to Immigration Court proceedings, including removal proceedings."

We accord no deference to an agency's unofficial, non-binding statements of policy that are unmoored from any interpretation of the governing statute or its regulations. *Cf. Auer v. Robbins*, 519 U.S. 452, 462 (1997) (in certain circumstances, deference is owed an agency's reasonable interpretation "of [its] own regulations"); *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.* 467 U.S. 837, 842–43 (1984) (deference is owed an agency's reasonable interpretation of an ambiguous statutory provision); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (granting "respect" to an agency's *official* policy statement).  At most, the DHS official highlighted a practice of encouraging IJs to recognize eligibility for SIJ status and to provide notice to aliens of the state court process.  As for the training manual, it simply offers information on the SIJ process.  That is a far cry from an agency's official policy based on a reasonable interpretation of the INA or its implementing regulations.

status is not "apparent."   It is speculative at best that a California court would "declare[ C.J.] dependent upon a juvenile court."  8 C.F.R. § 204.11(c)(3).  That is because, unlike the petitioner in *Cabrera-Ochoa*, who was effectively orphaned by the "neglect" and "abandonment" of *both* his parents, C.J. remains in the custody of his devoted mother. *Cf. Cabrera-Ochoa*, 2016 WL 4204551, at *8–9.  "Apparent eligibility" requires something more—i.e., facts that plainly indicate a "reasonable possibility" of eligibility for immigration relief.   *Lopez-Velasquez*, 629 F.3d at 896. Instead, C.J. piles inference upon inference.  He first assumes that a state court would deem him dependent on that court notwithstanding his mother's continued custody of him. Based on that assumption, he then makes another: that an IJ would exercise her discretion to grant C.J. SIJ status even though "reunification with 1 . . . of [C.J.'s] parents *is* . . . viable."  8 U.S.C. § 1101(a)(27)(i) (emphasis added); *see also* 8 C.F.R. § 204.11.  Both assumptions are laden with a heavy dose of speculation, all the more so when set against the backdrop of C.J.'s failure to pursue the required state court process.

For all these reasons, we hold that the IJ was not required to inform C.J. that he might be eligible for SIJ status.  Our determination necessarily disposes of C.J.'s claimed right to court-appointed counsel at government expense for purposes of pursuing the requisite state court action.

## VI.

Finally, C.J. seeks relief under CAT, 8 C.F.R. § 1208.16(c). CAT prevents the United States from removing an alien to a country where it is more likely than not that he will be tortured by or with the acquiescence of the

government. *Muradin v. Gonzales*, 494 F.3d 1208, 1210 (9th Cir. 2007); 8 C.F.R. § 1208.16(c)(2). Torture involves intentional infliction of

> severe pain or suffering, whether physical or mental . . . for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). Unlike the standards for asylum and withholding of removal, a petitioner "need not show that he will be tortured on account of a protected ground" to qualify for CAT relief. *Muradin*, 494 F.3d at 1211.

The IJ concluded that C.J.'s "fear[] of the gangs and problems that he had with the gangs in Honduras . . . falls short of the requirement to show a particularized threat of torture." The Board affirmed, and we agree.

C.J. argues that the IJ and the Board erred in denying his CAT claim because the record "contain[s] more than sufficient evidence to establish C.J.[]'s entitlement to protection under CAT." C.J. points to the fact that the Maras put a gun to his head and the State Department report's discussion of gangs killing minors for resisting their recruitment efforts.

Substantial evidence supports the Board's conclusion. While having a gun pointed at one's head is no doubt deeply traumatizing, the Board did not err in finding that it did not amount to "severe pain or suffering." Nor was there any

showing that the Honduran government acquiesced in the act. *See* 8 C.F.R. § 1208.18(a)(1). As discussed in the context of C.J.'s asylum claim, *see* Part III.C.2, *supra*, the record does not compel a finding that the government either turned a blind eye to the Maras' threats against C.J. or that it would be unable or unwilling to control the Maras in the future. *Cf. Muradin*, 494 F.3d at 1211 (granting CAT relief where the applicant presented evidence that he was tortured by security officers in his home country of Armenia, and where a State Department report detailed routine beatings and torture by the security services). We therefore deny C.J.'s petition for review on his CAT claim.

## CONCLUSION

We are mindful that our decision means that, absent a reprieve offered by the government, C.J. will likely be returned to a country in turmoil. We sympathize with his personal plight, as C.J. appears to have displayed courage in the face of serious adversity. But while "our hearts are with [C.J.]," the law does not support his requested relief. *Cf. Dugard v. United States*, 835 F.3d 915, 917 (9th Cir. 2016). Neither Supreme Court nor circuit precedent compels the remedy that C.J. seeks: court-appointed counsel at government expense. And to the extent the IJ failed to provide all the trappings of a full and fair hearing, any shortcomings did not prejudice the outcome because the IJ adequately developed the record on issues that are dispositive to C.J.'s claims for relief. Attorney representation could not have altered this reality, which forecloses C.J.'s claim to an implied right to court-appointed counsel under the Due Process Clause. Moreover, the INA itself neither provides for nor implies a right to court-appointed counsel at government expense.

We further hold that the IJ was not required to advise C.J. of a separate state court process that could ultimately form the predicate for C.J.'s application for SIJ status with the IJ. The IJ is only required to advise an alien of relief for which he is "apparent[ly] eligib[le]." Because C.J.'s claimed relief—SIJ status—depends on a state court making certain findings before an IJ may grant him such relief—something that has not occurred here—C.J. is not "apparent[ly] eligib[le]" for SIJ status.

Finally, we decline to reverse the Board's denial of C.J.'s asylum, withholding of removal, and CAT claims, because substantial evidence supports the Board's determination that he is ineligible for any such relief.

**PETITION FOR REVIEW DENIED.**

OWENS, Circuit Judge, concurring:

I concur in the majority opinion and its narrow scope. It holds that the Due Process Clause does not mandate government-funded counsel for C.J.L.G, an accompanied minor. The opinion does not hold, or even discuss, whether the Due Process Clause mandates counsel for unaccompanied minors. That is a different question that could lead to a different answer. *See, e.g.*, *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 31–32 (1981) (holding that whether the Due Process Clause requires the appointment of counsel is considered on a case-by-case basis); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1039–41 (9th Cir. 2016) (McKeown, J.,

joined by M. Smith, J., specially concurring) (outlining unique challenges that unrepresented unaccompanied minors in immigration proceedings confront).